## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN   DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **JASON DIAMOND** | : | |
| 6901 W. Ridgeview Ct. | : | |
| Mequon, WI 53092 | : | **Civil Action No.** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SHIFTPIXY, INC.** | : | |
| 1 Venture, Suite 150 | : | |
| Irvine, CA 92618 | : | |
| and | : | |
| **SCOTT ABSHER** | : | |
| 1 Venture, Suite 150 | : | |
| Irvine, CA 92618 | : | |
| **Defendants** | : | |

### COMPLAINT

Plaintiff Jason Diamond ("Diamond"), by and through his attorneys Alan L. Frank Law

Associates, P.C., hereby files his Complaint against Defendants Shiftpixy, Inc. ("ShiftPixy") and

Scott Absher, and   alleges as follows:

### NATURE OF THE ACTION

1.      This action presents, in part, a straightforward breach of contract claim.   As will be

described more fully below, Defendant Shiftpixy has a binding and enforceable

contractual obligation to deliver a number of warrants for shares of its Common Stock to

Diamond as a placement fee for equity or equity linked securities issued by Shiftpixy.

Diamond, by and through Drexel Hamilton, LLC ("Drexel Hamilton"), has satisfied his

end of the bargain: Drexel Hamilton obtained bridge financing for Shiftpixy, for which

1

Diamond is contractually entitled to warrants as placement compensation.   Diamond's warrants, which are yet to be delivered to him, contained provisions that protected Diamond from successive Shiftpixy issuance[s] of shares of its Common Stock at below the exercise price of Diamond's warrants by adjusting the latter's exercise price and number of Common Stock shares to be received upon exercise. Shiftpixy filed forms 8K, S-3 and Amended S-3 with the SEC acknowledging registration of the warrants due and owing to Diamond with the precise Form of Warrant, which contained full ratchet anti-dilution protective provisions. On May 12, 2020, controlling shareholder, President, and Chief Executive Officer Defendant Scott Absher ("Absher") caused Shiftpixy to amend its Articles of Incorporation to authorize Absher and another controlling shareholder to receive shares of Common Stock at $0.0001 per share (the "Sub-Penny Share Issuance").[1] Absher and another controlling shareholder each respectively purchased 12,500,000 shares at this sub-penny price thereby diluting other public shareholders to 4.8% of the outstanding shares of Common Stock of Shiftpixy.[2]   The Sub-Penny Share Issuance, and other dilutive events, described more fully below, triggered a reset in Diamond's warrants pursuant to the express terms of the anti-dilution provisions.   Diamond has demanded for

---

[1]As will be described more fully below, Absher and another controlling shareholder held preferred options exercisable into Shiftpixy preferred stock at $0.0001 per share of preferred stock. The preferred stock had no right to convert into shares of the Common Stock of Shiftpixy. Accordingly, Absher and the other controlling shareholder effectuated the Shiftpixy Articles amendment on May 12, 2020 to authorize Absher and the other controlling shareholder to convert shares of the preferred stock to shares of the Common Stock on a one-for-one basis, which gave rise to the Sub-Penny Share Issuance of the shares of Common Stock.

[2]Prior to the Sub-Penny Share Issuance, Shiftpixy disclosed that there were 1,220,197 shares of Common Stock issued and outstanding. See Schedule 14C Information Statement dated May 12, 2020, at pg. 4, attached hereto as **Exhibit "J"**.

Absher and Shiftpixy to deliver his contractually due warrants, adjusted in accordance with the anti-dilution provisions of the warrant for the Sub-Penny Share Issuance. In violation of iron-clad contractual commitments and admissions in Shiftpixy's SEC filings, as aided by their lawyers and accountants, Absher and Shiftpixy have unjustifiably refused to deliver the warrants to Diamond. Accordingly, Diamond now seeks specific performance of Shiftpixy's obligation to deliver the warrants, adjusted for the Sub-Penny Share Issuance, and damages resulting from Shiftpixy and Absher's breaches.

## PARTIES TO THE ACTION

2.     Plaintiff Diamond, is a citizen and resident of the state of Wisconsin.

3.     Defendant ShiftPixy is a Wyoming corporation with its principal place of business at 1 Venture, Suite 150, Irvine, California 92618. Defendant ShiftPixy is a publicly traded company on the Nasdaq Capital Market whose shares are traded under the ticker symbol "PIXY." According to its public filings, Defendant ShiftPixy is a specialized staffing and human capital management service provider that provides solutions for large contingent part-time workforce demands, primarily in the restaurant, hospitality and maintenance service trades.

4.     Defendant Absher is a natural person who, upon information and belief, is a citizen and resident of the state of California. Defendant Absher is the Chief Executive Officer and Director of Defendant ShiftPixy. For purposes of diversity under 28 U.S.C. § 1332(a), Defendant Absher is a citizen of California.

3

## JURISDICTION

5.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a), in that the matter in

controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is

between citizens of different States.

6.    This Court has subject matter jurisdiction over Plaintiff's claims in this action pursuant to

28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of Wisconsin, and Defendants are

citizens of California and Wyoming, and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

## VENUE

7.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) in that a substantial part of

the events giving rise to the claims asserted herein occurred in this judicial district and is

the exclusive judicial district in which defendant, by written agreement, has consented to

venue. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the parties

have designated this District as the stipulated venue for adjudication of their disputes.

8.    Defendant has consented to personal jurisdiction pursuant to the written instruments at

issue herein. Specifically, Section 16 of the Exclusive Investment Banking Agreement

dated September 26, 2018 provides:

**All aspects of the relationship created by this Agreement or the engagement
hereunder, any other agreements relating to the engagement hereunder and all
claims or causes of action (whether in contract, tort or otherwise) that may be based
upon, arise out of or relate to this Agreement or the engagement hereunder shall be
governed by and construed in accordance with the laws of the State of New York,
applicable to contracts made and to be performed therein and, in connection
therewith.  The parties consent to the exclusive jurisdiction of the Courts located in
New York County, New York, in connection with any claim or dispute relating to
this Agreement or any services or advice provided hereunder. ...Notwithstanding the
foregoing, solely for purposes of enforcing the Company's [Defendant Shiftpixy's]**

4

obligations under <u>Annex A</u> or <u>Annex B</u>, the Company [Defendant Shiftpixy] consents to personal jurisdiction, service, and venue in any court proceeding in which any claim or cause of action relating to or arising out of this agreement or the engagement hereunder is brought by or against any indemnified Person [defined to include Plaintiff Diamond].

The Exclusive Investment Banking Agreement dated September 26, 2018 is identified as "Highly Confidential" and is therefore not attached as an Exhibit hereto.

## FACTUAL BACKGROUND

### The Investment Banking Agreement

9.      On September 26, 2018 Defendant Shiftpixy, its subsidiaries and affiliates, entered into an Exclusive Investment Banking Agreement with Stifel, Nicolaus & Company, Incorporated ("Stifel"), and Drexel Hamilton for Stifel and Drexel Hamilton to act as Defendant Shiftpixy's "exclusive financial advisors and placement agents in connection with one or more capital raises" for Defendant Shiftpixy (the "Investment Banking Agreement").   See the Investment Banking Agreement (which is identified thereon as "Highly Confidential" and is therefore not attached as an Exhibit hereto).

10.     The Investment Banking Agreement, at paragraph 2 titled "Compensation" specifically provides as follows:

    **Section 2.     <u>Compensation</u>.   The Company agrees to pay the following compensation to the Agents[3] in cash by wire transfer:**

    .....

---

[3]The Investment Banking Agreement provides that each of Stifel and Drexel Hamilton [is] an **"Agent"** and Drexel Hamilton and Stifel are collectively referred to as the **"Agents"**.

If during the term[4] or Tail Period (as defined in Section 9)[5] of this Agreement, the Company enters into a definitive agreement with an Investor[6] with respect to a Transaction[7] or consummates a Transaction with any Investorm the Company [Defendant Shiftpixy] agrees to pay Stifel and Drexel Hamilton the following fees on the closing date of each such Transaction

....

**C.**     **Warrant Placement Fees.**

    **I.**     *A number of warrants equal to 6.0% of the gross proceeds paid for any equity or equity-linked securities issues by the Company (including, without limitation, any debt plus warrant structure)*; and

    **ii.**     A number of warrants equal to 3.0% of the face value of any non-convertible or non-equity-linked debt facility or committed line of credit, including any undrawn but committed amounts (excluding any debt plus warrant structure), divided by the exercise price.

---

[4]"Term" is defined in Section 8 of the Investment Banking Agreement as follows:
    **Section 8.    Term.    Unless otherwise agreed to in writing by the parties hereto, this Agreement shall terminate upon the twelve (12) month anniversary of the date hereof (the 'Term').**

[5]"Tail Period" is defined in Section 9 of the Investment Banking Agreement as follows: **"With respect to ay Transaction, if within the twelve (12) month period following the term or termination of this Agreement by the Company (the 'Tail Period'), the Company [Defendant Shiftpixy] or any of its subsidiaries or affiliates consummates any transaction with an Investor or its affiliates, Drexel Hamilton and Stifel shall be entitled to payment in full of the fees described in Section 2, as applicable , of this Agreement with respect to such transaction or transactions."**

[6] "Investor" is defined in Section 1 of the Investment Banking Agreement as follows: **"'Investors' shall include persons or entities (and their affiliates) introduced by the Agents [defined as Stifel and Drexel Hamilton] to the Company [Defendant Shiftpixy]. Investors shall also include persons or entities (and their affiliates) introduced by the Company [Defendant Shiftpixy] to the Agents [defined as Stifel and Drexel Hamilton] during the Term of this Agreement and any person or entity (and their affiliates) that seeks to enter into, or actually enters into any Transaction with the Company [Defendant Shiftpixy] during the Term of this Agreement."**

[7]"Transaction" is defined in the Investment Banking Agreement as follows: **"One or more capital raises for the Company [Defendant Shiftpixy] (each a 'Transaction')"**

> *The Warrants shall have a term or five-years, contain cashless exercise provisions and piggyback registration rights, providing the Agents with the right to purchase one share of the Company's common stock per Warrant with an exercise price equal to (a) the implied per share valuation received by the participating Investors in the Transaction, or (b) in the event of no valuation mechanism in the Transaction, an exercise price equal to 110% of the 10-day VWAP for the 10-day period immediately preceding the closing of the Transaction (the "Exercise Price").*

**Each of Stifel and Drexel Hamilton shall receive 50% of each of the cash placement fee set forth in Section 2(B) and the warrant placement fee set forth in Section 2(c).**

*At each Agent's option and upon such Agent's written instructions to the Company, the Company shall issue all or a portion of any warrants due to such Agent under this Agreement directly to specified employees of such Agent.* **The warrants and the shares issuable upon exercise of the warrants may constitute restricted shares and may contain restrictive legends indicating such restrictions; provided however, that the warrants any shares issuable shall contain piggyback registration rights requiring their inclusion with any registration statement filed by the Company.  In the event no registration statement is filed, the Company's counsel shall be responsible for drafting and executing the Rule 144 comfort letter (and any other required paperwork as required by the transfer agent), at the Company's expense, providing for the sale of such underlying shares.**

**The Company shall not enter any agreement with any Investor that contains any provision that limits or modifies the terms of this Agreement or that does not contain a provision that expressly states the Agents' entitlement to and the amount of its compensation that would be due pursuant to the Agreement if a Transaction is consummated....**

See the Investment Banking Agreement(emphasis added) (which is identified thereon as

"Highly Confidential" and is therefore not attached as an Exhibit hereto, but can be filed

under seal and/or provided to the Court and/or Parties).

## Bridge Financing Obtained by Shiftpixy As A Result of Drexel Hamilton Introduction

11.    By March of 2019 Shiftpixy was in desperate need of operating capital, and Drexel

Hamilton, through Plaintiff Diamond, introduced Shiftpixy to institutional investors who

could provide it bridge financing.

7

12.     During the term of the Investment Banking Agreement, on March 11, 2019, Defendant

ShiftPixy, entered into a Securities Purchase Agreement with institutional investors

introduced to them by Drexel Hamilton for the sale and issuance by Shiftpixy of

$4,750,000 of Senior Convertible Notes due September 12, 2020.   Concurrently with the

sale of said Notes, pursuant to said Securities Purchase Agreement, Defendant Shiftpixy

agreed to issue and sell immediately exercisable warrants to purchase 2,840,909 shares of

its common stock at an exercise price equal to $1.75 per share (subject to adjustments as

provided under the terms of the warrants), and Shiftpixy received aggregate gross

proceeds of approximately $3,750,000 in this offering (collectively the "March 2019

Bridge Financing") .   See Defendant Shiftpixy's Form 8K dated March 12, 2019,

attached hereto as **Exhibit "A"**.

13.     The closing of the March 2019 Bridge Financing and sales of these securities to the

institutional investors introduced to Defendant Shiftpixy by Drexel Hamilton occurred on

or about March 12, 2019.   See Defendant Shiftpixy's Form 8K dated March 12, 2019,

attached hereto as **Exhibit "A"**.

## As a Result of the March 2019 Bridge Financing Plaintiff Diamond is Entitled to Warrants Under the Investment Banking Agreement

14.     Defendant Shiftpixy's Form 8K dated March 12, 2019 acknowledges that placement fees

are due with respect to the March 2019 Bridge Financing and states " We will pay cash,

issue warrants, and reimburse expenses to placement agents for the transactions described

herein." See Defendant Shiftpixy's Form 8K dated March 12, 2019, attached hereto as

**Exhibit "A"**.

15.     There is only one Form of Warrant, which is attached as Exhibit No. 4.2 to Defendant

Shiftpixy's Form 8K dated March 12, 2019.   See Defendant Shiftpixy's Form of Warrant

(attached as Exhibit No. 4.2 to Defendant Shiftpixy's 8K dated March 12, 2019), attached

hereto as **Exhibit "B"**.

16.     On April 1, 2019 Defendant Shiftpixy filed a Registration Statement under the Securities

Act of 1933, Form S-3, which provided,   in relevant part:

**This registration statement (the "Registration Statement") registers up to (I) 30,645,161 shares of our common stock par value $0.0001 per share (the "Common Stock"), issuable upon the repayment and/or conversion of an aggregate principal amount of $4,750,000 of Senior Convertible Notes, due September 12, 2020 (the "Notes"), and convertible into shares of Common Stock at a conversion price of $1.67 per share, subject to adjustment, as provided in the Notes, with a minimum floor price of $0.31 per share, (ii) 5,681,818 shares of Common Stock issuable upon exercise of certain common stock purchase warrants granted to certain investors at an exercise price of $1.75 per share, and (iii) _85,228 shares of Common Stock issuable upon exercise of warrants granted to Drexel Hamilton, LLC, in its role as advisor, at an exercise price of $1.75 per share, but subject to a right of cashless exercise_,   ((ii) and (iii) collectively, the "Warrants").   In addition, pursuant to Rule 416(a) of the Securities Act of 1933, as amended (the "Securities Act"), this Registration Statement shall also cover any additional shares of common stock that become issuable by reason of any stock dividends, stock splits, recapitalizations or other similar events effected without receipt of consideration that increases the number of the registrant's outstanding shares of common stock.**

See Defendant Shiftpixy's Form S-3 dated April 1, 2019 (emphasis added), attached

hereto as **Exhibit "C"**.

17.     Defendant Shiftpixy's Form S-3 dated April 1, 2019, at pages 35-36, in the Section titled

"Selling Shareholders", states that Drexel Hamilton owned 302,095 shares of Common

Stock prior to this offering, has 85,228 shares of Common Stock to be sold pursuant to

the Prospectus, and further at footnote (7) thereto states   "A total of 100,756 warrants

owned by Drexel Hamilton, LLC, and 201,339 warrants distributed by Drexel Hamilton,

LLC, _to its affiliates as follows 150,578 to Jason Diamond_, 30,000 to Stephen Mooney

and 20,761 to Roger Elsas". See   **Exhibit "C"**, at pgs. 35-36.

18.     The Form of Warrant attached as an Exhibit to Defendant Shiftpixy's Form S-3 dated

April 1, 2019 incorporates by reference the Form of Warrant attached to Defendant

Shiftpixy's Form 8-K dated March 12, 2019, and both provide, in relevant part, as

follows:

**1. EXERCISE OF WARRANT.**

**(a)      Mechanics of Exercise. Subject to the terms and conditions hereof (including, without limitation, the limitations set forth in Section 1(f)), this Warrant may be exercised by the Holder on any day on or after the Issuance Date (an "Exercise Date"), in whole or in part, by delivery (whether via facsimile or otherwise) of a written notice, in the form attached hereto as Exhibit A (the "Exercise Notice"), of the Holder's election to exercise this Warrant. Within one (1) Trading Day following an exercise of this Warrant as aforesaid, the Holder shall deliver payment to the Company of an amount equal to the Exercise Price in effect on the date of such exercise multiplied by the number of Warrant Shares as to which this Warrant was so exercised (the "Aggregate Exercise Price") in cash or via wire transfer of immediately available funds if the Holder did not notify the Company in such Exercise Notice that such exercise was made pursuant to a Cashless Exercise (as defined in Section 1(d)). The Holder shall not be required to deliver the original of this Warrant in order to effect an exercise hereunder. Execution and delivery of an Exercise Notice with respect to less than all of the Warrant Shares shall have the same effect as cancellation of the original of this Warrant and issuance of a new Warrant evidencing the right to purchase the remaining number of Warrant Shares. Execution and delivery of an Exercise Notice for all of the then-remaining Warrant Shares shall have the same effect as cancellation of the original of this Warrant after delivery of the Warrant Shares in accordance with the terms hereof. On or before the first (1st) Trading Day following the date on which the Company has received an Exercise Notice, the Company shall transmit by facsimile or electronic mail an acknowledgment of confirmation of receipt of such Exercise Notice, in the form attached hereto as Exhibit B, to the Holder and the Company's transfer agent (the "Transfer Agent"), which confirmation shall constitute an instruction to the Transfer Agent to process such Exercise Notice in accordance with the terms herein. On or before the second (2nd) Trading Day following the date on which the Company has received such Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date), the Company shall (X) provided that the Transfer Agent is participating in**

The Depository Trust Company ("DTC") Fast Automated Securities Transfer Program, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal at Custodian system, or (Y) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, upon the request of the Holder, issue and deliver (via reputable overnight courier) to the address as specified in the Exercise Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled pursuant to such exercise. Upon delivery of an Exercise Notice, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares (as the case may be). If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant submitted for exercise is greater than the number of Warrant Shares being acquired upon an exercise and upon surrender of this Warrant to the Company by the Holder, then, at the request of the Holder, the Company shall as soon as practicable and in no event later than two (2) Business Days after any exercise and at its own expense, issue and deliver to the Holder (or its designee) a new Warrant (in accordance with Section 7(d)) representing the right to purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number. The Company shall pay any and all transfer, stamp, issuance and similar taxes, costs and expenses (including, without limitation, fees and expenses of the Transfer Agent) that may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant. Notwithstanding the foregoing, except in the case where an exercise of this Warrant is validly made pursuant to a Cashless Exercise), the Company's failure to deliver Warrant Shares to the Holder on or prior to the later of ((i) two (2) Trading Days after receipt of the applicable Exercise Notice (or such earlier date as required pursuant to the 1934 Act or other applicable law, rule or regulation for the settlement of a trade of such Warrant Shares initiated on the applicable Exercise Date) and (ii) one (1) Trading Day after the Company's receipt of the Aggregate Exercise Price (or valid notice of a Cashless Exercise (such later date, the "Share Delivery Date") shall not be deemed to be a breach of this Warrant. Notwithstanding anything to the contrary contained in this Warrant or the Registration Rights Agreement, after the effective date of the Registration Statement (as defined in the Registration Rights Agreement) and prior to the Holder's receipt of the notice of a Grace Period (as defined in the Registration Rights Agreement), the Company shall cause the Transfer Agent to deliver

11

unlegended shares of Common Stock to the Holder (or its designee) in connection with any sale of Registrable Securities (as defined in the Registration Rights Agreement) with respect to which the Holder has entered into a contract for sale, and delivered a copy of the prospectus included as part of the particular Registration Statement to the extent applicable, and for which the Holder has not yet settled. From the Issuance Date through and including the Expiration Date, the Company shall maintain a transfer agent that participates in the DTC's Fast Automated Securities Transfer Program.

(b) Exercise Price. For purposes of this Warrant, "Exercise Price" means $1.75, subject to adjustment as provided herein.

(c) Company's Failure to Timely Deliver Securities. If the Company shall fail, for any reason or for no reason, on or prior to the Share Delivery Date, either (I) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, to issue and deliver to the Holder (or its designee) a certificate for the number of Warrant Shares to which the Holder is entitled and register such Warrant Shares on the Company's share register or, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, to credit the balance account of the Holder or the Holder's designee with DTC for such number of Warrant Shares to which the Holder is entitled upon the Holder's exercise of this Warrant (as the case may be) or (II) if a Registration Statement covering the resale of the Warrant Shares that are the subject of the Exercise Notice (the "Unavailable Warrant Shares") is not available for the resale of such Unavailable Warrant Shares and the Company fails to promptly, but in no event later than as required pursuant to the Registration Rights Agreement (x) so notify the Holder and (y) deliver the Warrant Shares electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit/Withdrawal At Custodian system (the event described in the immediately foregoing clause (II) is hereinafter referred as a "Notice Failure" and together with the event described in clause (I) above, a "Delivery Failure"), and if on or after such Share Delivery Date the Holder purchases (in an open market transaction or otherwise) shares of Common Stock corresponding to all or any portion of the number of shares of Common Stock issuable upon such exercise that the Holder is entitled to receive from the Company and has not received from the Company in connection with such Delivery Failure or Notice Failure, as applicable (a "Buy-In"), then, in addition to all other remedies available to the Holder, the Company shall, within two (2) Business Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (including, without limitation, by any other Person in respect, or on behalf, of the Holder) (the "Buy-In Price"), at

which point the Company's obligation to so issue and deliver such certificate (and to issue such shares of Common Stock) or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) (and to issue such Warrant Shares) shall terminate, or (ii) promptly honor its obligation to so issue and deliver to the Holder a certificate or certificates representing such Warrant Shares or credit the balance account of such Holder or such Holder's designee, as applicable, with DTC for the number of Warrant Shares to which the Holder is entitled upon the Holder's exercise hereunder (as the case may be) and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of Warrant Shares multiplied by (B) the lowest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date of the applicable Exercise Notice and ending on the date of such issuance and payment under this clause (ii) (the "Buy-In Payment Amount"). Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing shares of Common Stock (or to electronically deliver such shares of Common Stock) upon the exercise of this Warrant as required pursuant to the terms hereof. While this Warrant is outstanding, the Company shall cause its transfer agent to participate in the DTC Fast Automated Securities Transfer Program. In addition to the foregoing rights, (i) if the Company fails to deliver the applicable number of Warrant Shares upon an exercise pursuant to Section 1 by the applicable Share Delivery Date, then the Holder shall have the right to rescind such exercise in whole or in part and retain and/or have the Company return, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an exercise shall not affect the Company's obligation to make any payments that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and (ii) if a registration statement covering the issuance or resale of the Warrant Shares that are subject to an Exercise Notice is not available for the issuance or resale, as applicable, of such Exercise Notice Warrant Shares and the Holder has submitted an Exercise Notice prior to receiving notice of the non-availability of such registration statement and the Company has not already delivered the Warrant Shares underlying such Exercise Notice electronically without any restrictive legend by crediting such aggregate number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, the Holder shall have the option, by delivery of notice to the Company, to (x) rescind such Exercise Notice in whole or in part and retain or have returned, as the case may be, any portion of this Warrant that has not been exercised pursuant to such Exercise Notice; provided that the rescission of an Exercise Notice shall not affect the Company's obligation to make any payments

13

that have accrued prior to the date of such notice pursuant to this Section 1(c) or otherwise, and/or (y) switch some or all of such Exercise Notice from a cash exercise to a Cashless Exercise.

(d) Cashless Exercise. Notwithstanding anything contained herein to the contrary (other than Section 1(f) below), if at the time of exercise hereof a Registration Statement (as defined in the Registration Rights Agreement) is not effective (or the prospectus contained therein is not available for use) for the resale by the Holder of all of the Warrant Shares, then the Holder may, in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of Warrant Shares determined according to the following formula (a "Cashless Exercise"):

$$\text{Net Number} = \frac{(A \times B) - (A \times C)}{D}$$

For purposes of the foregoing formula:

A= the total number of shares with respect to which this Warrant is then being exercised.

B = the VWAP of the Common Stock at the close of business on the Principal Market as of the Trading Day immediately prior to the date of the delivery of the applicable Exercise Notice.

C = the Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.

D = the VWAP of the Common Stock at the close of business on the Principal Market on the date of the delivery of the applicable Exercise Notice.

If the Warrant Shares are issued in a Cashless Exercise, the parties acknowledge and agree that in accordance with Section 3(a)(9) of the 1933 Act, the Warrant Shares take on the registered characteristics of the Warrants being exercised. For purposes of Rule 144(d) promulgated under the 1933 Act, as in effect on the Subscription Date, it is intended that the Warrant Shares issued in a Cashless Exercise shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date this Warrant was originally issued pursuant to the Securities Purchase Agreement.

(e) Disputes. In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the number of Warrant Shares to be issued pursuant to

the terms hereof, the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed and resolve such dispute in accordance with Section 13.

See Form S-3 dated April 1, 2019, attached hereto as **Exhibit "C";**   Form of Warrant attached as Exhibit 4.2 to Defendant Shiftpixy's Form S-3 dated April 1, 2019, attached hereto as **Exhibit "D";** and compare with Form of Warrant attached as Exhibit 4.2 to Defendant Shiftpixy's Form 8K dated March 12, 2019, attached as **Exhibit "B"** hereto.

19.   As Shiftpixy repeatedly discloses in multiple filings with the SEC, the Form of Warrant, which was attached as Exhibits to both Defendant Shiftpixy's Form 8-K dated March 12, 2019 and Form S-3 dated April 1, 2019 registering Plaintiff Diamond's warrants, contain "full-ratchet anti-dilution price protection provisions", which state in relevant part as follows:

2.      **ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.**

**(a) Stock Dividends and Splits. Without limiting any provision of Section 2(b), Section 3 or Section 4, if the Company, at any time on or after the Subscription Date, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in shares of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such**

15

subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b) Adjustment Upon Issuance of Shares of Common Stock. If and whenever on or after the Subscription Date, the Company issues or sells, or in accordance with this Section 2 is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "New Issuance Price") less than a price equal to the Exercise Price in effect immediately prior to such issuance or sale or deemed issuance or sale (such Exercise Price then in effect is referred to herein as the "Applicable Price") (the foregoing a "Dilutive Issuance"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced to an amount equal to the New Issuance Price. For all purposes of the foregoing (including, without limitation, determining the adjusted Exercise Price and the New Issuance Price under this Section 2(b)), the following shall be applicable:

(i) Issuance of Options. If the Company in any manner grants or sells any Options and the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Option or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 2(b)(i), the "lowest price per share for which one share of Common Stock is at any time issuable upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof and (y) the lowest exercise price set forth in such Option for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon the exercise of any such Options or upon conversion, exercise or exchange of any Convertible Securities issuable upon exercise of any such Option or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Option (or any other Person) upon the

granting or sale of such Option, upon exercise of such Option and upon conversion, exercise or exchange of any Convertible Security issuable upon exercise of such Option or otherwise pursuant to the terms thereof plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Option (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or otherwise pursuant to the terms of or upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities.

(ii) Issuance of Convertible Securities. If the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 2(b)(ii), the "lowest price per share for which one share of Common Stock is at any time issuable upon the conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof" shall be equal to (1) the lower of (x) the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to one share of Common Stock upon the issuance or sale of the Convertible Security and upon conversion, exercise or exchange of such Convertible Security or otherwise pursuant to the terms thereof and (y) the lowest conversion price set forth in such Convertible Security for which one share of Common Stock is issuable (or may become issuable assuming all possible market conditions) upon conversion, exercise or exchange thereof or otherwise pursuant to the terms thereof minus (2) the sum of all amounts paid or payable to the holder of such Convertible Security (or any other Person) upon the issuance or sale of such Convertible Security plus the value of any other consideration received or receivable by, or benefit conferred on, the holder of such Convertible Security (or any other Person). Except as contemplated below, no further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock upon conversion, exercise or exchange of such Convertible Securities or otherwise pursuant to the terms thereof, and if any such issuance or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of this Warrant has been or is to be made pursuant to other provisions of this Section 2(b), except as contemplated below, no further adjustment of the Exercise Price shall be made by reason of such issuance or sale.

17

(iii) **Change in Option Price or Rate of Conversion.** If the purchase or exercise price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exercise or exchange of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exercisable or exchangeable for shares of Common Stock increases or decreases at any time (other than proportional changes in conversion or exercise prices, as applicable, in connection with an event referred to in Section 2(a)), the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 2(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 2(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

(iv) **Calculation of Consideration Received.** If any Option and/or Convertible Security and/or Adjustment Right is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "Primary Security," and such Option and/or Convertible Security and/or Adjustment Right, the "Secondary Securities"), together comprising one integrated transaction, (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing) the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be equal to the difference of (x) the lowest price per share for which one share of Common Stock was issued (or was deemed to be issued pursuant to Section 2(b)(i) or 2(b)(ii) above, as applicable) in such integrated transaction solely with respect to such Primary Security, minus (y) with respect to such Secondary Securities, the sum of (I) the Black Scholes Consideration Value of each such Option, if any, (II) the fair market value (as determined by the Holder in good faith) or the Black Scholes Consideration Value, as applicable, of such Adjustment Right, if any, and (III) the fair market value (as determined by the Holder) of such Convertible Security, if any, in each case, as determined on a per share basis in

18

accordance with this Section 2(b)(iv). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the net amount of consideration received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company for such securities will be the arithmetic average of the VWAPs of such security for each of the five (5) Trading Days immediately preceding the date of receipt. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor (for the purpose of determining the consideration paid for such Common Stock, Option or Convertible Security, but not for the purpose of the calculation of the Black Scholes Consideration Value) will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities (as the case may be). The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Holder. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "Valuation Event"), the fair value of such consideration will be determined within five (5) Trading Days after the tenth (10th) day following such Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Holder. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v) Record Date. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issuance or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such

19

right of subscription or purchase (as the case may be).

(c) *Number of Warrant Shares. Simultaneously with any adjustment to the Exercise Price pursuant to this Section 2, the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment (without regard to any limitations on exercise contained herein).*

(d) Holder's Right of Alternative Exercise Price Following Issuance of Certain Options or Convertible Securities. In addition to and not in limitation of the other provisions of this Section 2, if the Company in any manner issues or sells or enters into any agreement to issue or sell, any Common Stock, Options or Convertible Securities (any such securities, "Variable Price Securities") after the Subscription Date that are issuable pursuant to such agreement or convertible into or exchangeable or exercisable for shares of Common Stock at a price which varies or may vary with the market price of the shares of Common Stock, including by way of one or more reset(s) to a fixed price, but exclusive of such formulations reflecting customary anti-dilution provisions (such as share splits, share combinations, share dividends and similar transactions) (each of the formulations for such variable price being herein referred to as, the "Variable Price"), the Company shall provide written notice thereof via facsimile and overnight courier to the Holder on the date of such agreement and the issuance of such Convertible Securities or Options. From and after the date the Company enters into such agreement or issues any such Variable Price Securities, the Holder shall have the right, but not the obligation, in its sole discretion to substitute the Variable Price for the Exercise Price upon exercise of this Warrant by designating in the Exercise Notice delivered upon any exercise of this Warrant that solely for purposes of such exercise the Holder is relying on the Variable Price rather than the Exercise Price then in effect. The Holder's election to rely on a Variable Price for a particular exercise of this Warrant shall not obligate the Holder to rely on a Variable Price for any future exercises of this Warrant.

(e) Stock Combination Event Adjustment. If at any time and from time to time on or after the Issuance Date there occurs any stock split, stock dividend, stock combination recapitalization or other similar transaction involving the Common Stock (each, a "Stock Combination Event," and such date thereof, the "Stock Combination Event Date") and the Event Market Price is less than the Exercise Price then in effect (after giving effect to the adjustment in clause 2(a) above), then on the sixteenth (16th) Trading Day immediately following such Stock Combination Event, the Exercise Price then in effect on such sixteenth (16th) Trading Day (after giving effect to the adjustment in clause 2(a) above) shall be reduced (but in no event increased) to the Event Market Price. For the avoidance of doubt, if the

adjustment in the immediately preceding sentence would otherwise result in an increase in the Exercise Price hereunder, no adjustment shall be made.

(f) Other Events. In the event that the Company (or any Subsidiary (as defined in the Securities Purchase Agreement)) shall take any action to which the provisions hereof are not strictly applicable, or, if applicable, would not operate to protect the Holder from dilution or if any event occurs of the type contemplated by the provisions of this Section 2 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's board of directors shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the number of Warrant Shares (if applicable) so as to protect the rights of the Holder, provided that no such adjustment pursuant to this Section 2(f) will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to this Section 2, provided further that if the Holder does not accept such adjustments as appropriately protecting its interests hereunder against such dilution, then the Company's board of directors and the Holder shall agree, in good faith, upon an independent investment bank of nationally recognized standing to make such appropriate adjustments, whose determination shall be final and binding absent manifest error and whose fees and expenses shall be borne by the Company.

(g) Calculations. All calculations under this Section 2 shall be made by rounding to the nearest cent or the nearest 1/100th of a share, as applicable. The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issuance or sale of Common Stock.

(h) Voluntary Adjustment by Company. The Company may at any time during the term of this Warrant, with the prior written consent of the Required Holders (as defined in the Securities Purchase Agreement), reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

See **Exhibits "B" and "D"** attached hereto (emphasis added); See also, Defendant

Shiftpixy's Amendment to Form S1 dated August 18, 2020, attached hereto as **Exhibit**

**"L"** (wherein Shiftpixy states "all of our warrants issued in connection with the March

2019 Notes (the "March 2019 Warrants")... included full-ratchet anti-dilution price

protection.")

20.   The full-ratchet anti-dilution price provisions[8] contained in the Shiftpixy Form of

Warrant attached to the Registration Statement registering "85,228 shares of Common

Stock issuable upon exercise of warrants granted to Drexel Hamilton, LLC, in its role as

advisor, at an exercise price of $1.75 per share, but subject to a right of cashless exercise"

are common protections provided in the context of bridge financing.

21.   The Form of Warrant, which was the only form of warrant attached as Exhibits to both

Defendant Shiftpixy's Form 8-K dated March 12, 2019 and Form S-3 dated April 1, 2019

registering Plaintiff Diamond's warrants, provides at paragraph 9, as follows:

**9. AMENDMENT AND WAIVER. Except as otherwise provided herein, the
provisions of this Warrant (other than Section 1(f)) may be amended and the
Company may take any action herein prohibited, or omit to perform any act herein
required to be performed by it, only if the Company has obtained the written
consent of the Holder. No waiver shall be effective unless it is in writing and signed
by an authorized representative of the waiving party.**

See See **Exhibits "B" and "D"** attached hereto.

22.   On April 21, 2019 the Chief Financial Officer of Defendant Shiftpixy, Patrice Launay,

emailed Plaintiff Diamond explaining that he had made a calculation error for the

Warrants owed to Drexel Hamilton and included in the Defendant Shiftpixy's Form S-3

---

[8]As simply explained by Investopedia: "Anti-dilution provisions act as a buffer to protect
investors against their equity ownership positions becoming diluted or less valuable. This can
happen when the percentage of an owner's stake in a company decreases because of an increase
in the total number of shares outstanding. Total shares outstanding may increase because of new
share issuance based on a round of equity financing. Dilution can also occur when holders of
stock options, such as company employees, or holders of other optionable securities exercise
their options."... "The two common types of anti-dilution clauses are known as 'full ratchet' and
'weighted average'. With a full ratchet provision, the conversion price of the existing preferred
shares is adjusted downward to the price at which new shares are issued in later rounds. Very
simply, if the original conversion price was $5 and in a later round the conversion price is $2.50,
the investor's original conversion price would adjust to $2.50." See
https://www.investopedia.com/terms/a/anti-dilutionprovision.asp

dated April 1, 2019, stating in relevant part as follows:

**I am writing up the accounting memorandum for the bridge financing, WHILE I AM ON VACATION, and noted that we registered 85,228 of warrants for Drexel. I cc Lewis even though the shares underlying Stifel warrants are not registered. I believe I made a mistake and wanted to run it by you.**

**The agreement spells out the following**

    C.    Warrant Placement Fees.

        i.    A number of warrants equal to 6.0% of the gross proceeds paid for any equity or equity-linked securities issued by the Company (including, without limitation, any debt plus warrant structure); and

**Gross proceeds are $3,750,000 or 6% of this amount is $225,000 divided by $1.67 to determine the underlying shares covering the warrants or 134,569 – 50% for Drexel is 67,285 as opposed to 85,228 as registered in the S-3.**

**The previous calculation which was included in the S-3 was calculated based on the**

**principal of $4,750,000 as opposed to gross proceeds**

See April 21, 2019 email from Defendant Shiftpixy's CFO to Plaintiff Diamond, attached

hereto as **Exhibit "E"**.

23.    Plaintiff Diamond, on Drexel Hamilton's behalf, agreed that the Warrants were calculated

in error and should be adjusted from 85,228, as registered in Defendant Shiftpixy's S-3

dated April 1, 2019, to 67,285.

24.    In accordance with said agreement to adjust and to correct the calculation error, on April

29, 2019 Defendant Shiftpixy filed an Amended Form S-3 which provides, in relevant

part as follows:

**(1) This registration statement (the "Registration Statement") registers up to (I) 30,645,161 shares of our common stock par value $0.0001 per share (the "Common Stock"), issuable upon the repayment and/or conversion of an aggregate principal amount of $4,750,000 of Senior Convertible Notes, due September 12, 2020 (the**

"Notes"), and convertible into shares of Common Stock at a conversion price of $1.67 per share, subject to adjustment, as provided in the Notes, with a minimum floor price of $0.31 per share, (ii) 5,681,818 shares of Common Stock issuable upon exercise of certain common stock purchase warrants granted to certain investors at an exercise price of $1.75 per share, and (iii) *67,285 shares of Common Stock issuable upon exercise of warrants granted to Drexel Hamilton, LLC, in its role as advisor, at an exercise price of $1.75 per share, but subject to a right of cashless exercise*, ((ii) and (iii) collectively, the "Warrants"). In addition, pursuant to Rule 416(a) of the Securities Act of 1933, as amended (the "Securities Act"), this Registration Statement shall also cover any additional shares of common stock that become issuable by reason of any stock dividends, stock splits, recapitalizations or other similar events effected without receipt of consideration that increases the number of the registrant's outstanding shares of common stock.

See Defendant Shiftpixy's Amended Form S-3 filed on April 29, 2019 (emphasis added),

at pg. 1, attached hereto as **Exhibit "F"** .

25.    At page 15 of Defendant Shiftpixy's Amended Form S-3 filed on April 29, 2019,

Defendant Shiftpixy states in the Section titled "The March 2019 Financing Transaction"

in relevant part as follows:

Warrants to purchase up to an aggregate of 2,908,194 shares of Common Stock. In connection with the issuance of the March Notes, a total of 2,840,909 Warrants (the "March Warrants") were issued to the selling shareholders that (a) have an initial exercise price of $1.75 per share (subject to adjustment as set forth therein), (b) become exercisable at any time on or after March 12, 2019, and on or prior to March 12, 2024, (c) contain certain ownership limitations that may restrict their exercise, as described under the caption "Selling Shareholders" in this prospectus, and (d) are exercisable on a cashless basis if at the time of exercise there is no effective registration statement registering, or the prospectus contained therein is not available for, the resale of shares of Common Stock for which the March Warrants are exercisable. *Warrants to purchase a total of 67,285 shares of Common Stock, were issued to Drexel Hamilton in its role as advisor, are exercisable on a cashless basis without any conditions.* The registration statement of which this prospectus is a part is not registering the offer or sale of any of the March Warrants.

See **Exhibit "F"**, at pg. 15 (emphasis added) .

24

26. At pages 36-37 of Defendant Shiftpixy's Amended Form S-3 filed on April 29, 2019, Defendant Shiftpixy states in the Section titled "Selling Shareholders", that Drexel Hamilton owned 284,152 shares of Common Stock prior to this offering, *has 67,285 shares of Common Stock to be sold pursuant to the Prospectus*, and further at footnote (7) thereto states "A total of 94,763 warrants owned by Drexel Hamilton, LLC, and 189,389 warrants distributed by Drexel Hamilton, LLC, to its affiliates as follows *140,052 to Jason Diamond*, 30,000 to Stephen Mooney and 19,338 to Roger Elsas". See **Exhibit "F"**, at pgs. 36-37 (emphasis added).

27. Defendant Shiftpixy's Amended Form S-3 dated April 29, 2019 incorporates by reference the Form of Warrant attached to Defendant Shiftpixy's Form 8-K dated March 12, 2019, which is the same Form of Warrant that was attached Defendant Shiftpixy's Form S-3 dated April 1, 2019, which Defendant Shiftpixy has repeatedly conceded contains "full-ratchet anti-dilution price protection" provisions.   See **Exhibit "F"**, at pg. 43; Also, attached hereto as **Exhibit "G"** is the Form of Warrant which is attached as Exhibit 4.2 to Defendant Shiftpixy's Amended Form S-3 dated April 29, 2019 (which is the Same Form of Warrant attached to Defendant Shiftpixy's Form 8-K dated March 12, 2019 and Form S-3 dated April 1, 2019, See **Exhibits "B" and "D"**); See also **Exhibit "L"**, at pg. 3 (wherein Shiftpixy states "all of our warrants issued in connection with the March 2019 Notes (the 'March 2019 Warrants')... included full-ratchet anti-dilution price protection.").

28. Notwithstanding Defendant Shiftpixy's Amended Form S-3 dated April 29, 2019, the

67,285 warrants to which Drexel Hamilton was entitled, which had been assigned to Plaintiff Jason Diamond per Section 2(c) of the Exclusive Investment Banking Agreement (the "Diamond Warrants"), and could only be in the Form of Warrant attached to the Amended Form S-3 dated April 29, 2019 and the Form S-3 dated April 1, 2019, which Shiftpixy repeatedly has admitted contained "full-ratchet anti-dilution price protection provisions", were not delivered. See **Exhibits "B", "C", "D" and "L"** attached hereto.

## The Shiftpixy 1:40 Reverse Stock Split

29.     On November 12, 2019 Defendant Shiftpixy's Board of Directors and majority shareholders authorized a 1 for 40 reverse stock split of Defendant Shiftpixy's issued and outstanding common stock, effective at market opening on December 16, 2019 (the "Reverse Stock Split").   See Defendant Shiftpixy's Form 8-K dated December 12, 2019, at pg. 2, attached hereto as **Exhibit "H"**; and Defendant Shiftpixy's Schedule 14C Information Statement dated November 25, 2019, attached hereto as **Exhibit "I"**.

30.     As a result of the Reverse Stock Split, each forty (40) shares of Shiftpixy's issued and outstanding common stock were automatically combined and converted into one issued and outstanding share of common stock.   See **Exhibit "L"**.

31.     Prior to the Reverse Stock Split Defendant Shiftpixy had 750,000,000 shares of common stock authorized and 35,723,762 shares of common stock issued and outstanding, and following the Reverse Stock Split, it had 750,000,000 shares of common stock authorized but 893,095 shares of common stock issued and outstanding. See **Exhibit "I"**, at pg. 3.

26

32.     The Reverse Stock Split did not alter the number of shares of preferred stock underlying Shiftpixy's preferred options and did not decrease the number of authorized shares of Shiftpixy's common stock or preferred stock, alter the par value of the common stock or preferred stock, both of which remained at $0.0001 per share, nor modify any voting rights or other terms of our capital stock. See **Exhibit "L"**.

**The 2019 and 2020 Exchange and Settlement Transactions**

33.     Between December 5, 2019 and March 24, 2020, Defendant Shiftpixy entered into a series of settlements, agreed upon note conversions, note exchanges, and principal repayments relating in part to the March 2019 Bridge Financing (the "Bridge Financing Settlements"). See **Exhibit "L"**, at Prospectus Summary, pg. 3 in the section titled "Convertible Note Settlements".

34.     More specifically, as part of the Bridge Financing Settlements, on March 23, 2020 and March 24, 2020, Defendant Shiftpixy amended, cancelled or exercised for shares of common stock via cashless exercise all warrants provided to the March 2019 Bridge Financing investor/lenders to remove the full-ratchet anti-dilution price protection provisions therein and issued new warrants (which did not contain anti dilution provisions) to purchase 423,669 shares of common stock at an exercise price of $10.17 per share.   See **Exhibit "L"**, at Prospectus Summary, pg. 3 in the section titled "Convertible Note Settlements".

35.     However, no such settlement, amendment, cancellation or issuance of new warrants was executed with or by Plaintiff Diamond and/or Drexel Hamilton relating to the Diamond Warrants.

27

36.     Notwithstanding that Defendant Shiftpixy never settled, amended, cancelled or issued
        new warrants to Plaintiff Diamond for the Diamond Warrants, Defendant Shiftpixy
        reported in its Amendment No. 1 to Form S-1 filing with the SEC on August 18, 2020 that
        Defendant Shiftpixy "amended, cancelled or exercised for shares of common stock via
        cashless exercise **all March 2019 Warrants** which previously included full-ratchet
        anti-dilution price protection and issued new warrants to purchase 423,669 shares of
        common stock at an exercise price of $10.17 per share". See **Exhibit "L"**, at Prospectus
        Summary, pg. 3 in the section titled "Convertible Note Settlements".

**The Vensure Asset Sale**

37.     On January 3, 2020 , effective January 1, 2020, Defendant Shiftpixy also entered into an
        asset purchase agreement with Shiftable HR Acquisitions LLC, part of Vensure
        Employer Services, Inc. ("Vensure"), that assigned client contracts representing
        approximately 70% of Shiftpixy's billable clients and certain operating assets in
        exchange for up to approximately $19.2 million of consideration, of which $9.7 million
        was received at closing and $9.5 million is due over the next four years (the "Vensure
        Asset Sale"). See Exhibit "L", at Prospectus Summary pg. 3.

**The AGP Public Offering**

38.     On May 20, 2020, Defendant Shiftpixy entered into an underwriting agreement with
        A.G.P./Alliance Global Partners ("A.G.P."), in connection with a public offering (the
        "May 2020 Public Offering") of an aggregate of (i) 1,898,850 shares of common stock,
        (ii) pre-funded warrants to purchase 323,310 shares of common stock and (iii) warrants to
        purchase 1,277,580 shares of common stock, which included the partial exercise of

A.G.P.'s overallotment option to purchase 166,500 additional warrants. The May 2020 Public Offering closed on May 26, 2020 and Defendant Shiftpixy received net proceeds of approximately $10.9 million after deducting underwriting discounts and commissions and estimated expenses associated with the May 2020 Public Offering.

39.     On June 11, 2020, and July 7, 2020, Defendant Shiftpixy closed partial over-allotment options exercised by A.G.P. to purchase, in the aggregate, 334,180 additional shares of common stock resulting in net proceeds of an aggregate of approximately $1.24 million after deducting underwriting discounts and commissions and estimated expenses.

40.     As Defendant Shiftpixy explained in its public filings, the May 2020 Public Offering included an assumed offering price of $4.65 per share, and purchasers of common stock in the May 2020 Public Offering "will experience immediate dilution of approximately $4.27 per share, assuming no exercise of the remaining Preferred Options...If the options, warrants and convertible securities we previously granted are exercised, additional dilution will occur". See **Exhibit "L"**.

41.     Defendant Shiftpixy further stated in its public filings that "as of August 14, 2020, options to purchase 42,559 shares of common stock at a weighted-average exercise price of $102.44 per share were outstanding, options to purchase 1,393,597 shares of common stock at a weighted-average exercise price of $5.32 per share subject to shareholder approval were outstanding, warrants to purchase up to 1,896,209 shares of common stock at a weighted-average exercise price of $8.42 per share were outstanding, and Preferred Options to purchase 11,858,560 shares of preferred stock at an exercise price of $0.0001

29

per share that are convertible into an equal number of shares of common stock were outstanding". See Exhibit "L", at Prospectus Summary, pg. 3.

42.   Defendant Shiftpixy further disclosed in its public filing that "if [it] raise[s] additional funding by issuing additional equity securities, the newly-issued shares will further dilute your percentage ownership of our shares and may also reduce the value of your investment. The discussion above assumes no exercise of the purchase warrants and no sale of pre-funded warrants, which, if sold, would reduce the number of shares of common stock that we are offering on a one-for-one basis until such warrants are exercised." See **Exhibit "L"**, at Risk Factors, pg. 9.

## Defendant Absher's Conversion of his Personal Preferred Shares and the Sub-Penny Share Issuance

43.   Absher and another controlling shareholder held preferred options exercisable into Shiftpixy preferred stock at $0.0001 per share of preferred stock. The preferred stock had no right to convert into shares of the Common Stock of Shiftpixy.

44.   On March 25, 2020, without a meeting of its shareholders, Defendant Shiftpixy filed Amended and Restated Articles of Incorporation (the "Amendment to Shiftpixy's Articles of Incorporation") to set conversion rights, which had not previously existed, for Defendant Shiftpixy's Class A Preferred Stock, par value $0.0001, to convert into Shifpixy's common stock on a one-for-one basis.   See Defendant Shiftpixy's Schedule 14C dated May 12, 2020, attached hereto as **Exhibit "J"**.

45.   Accordingly, Absher and the other controlling shareholder effectuated the Amendment of Shiftpixy's Articles of Incorporation to specifically authorize Absher and the other

30

controlling shareholder to convert shares of the preferred stock to shares of the common

stock on a one-for-one basis at $0.0001 per share, which gave rise to the Sub-Penny

Share Issuance of the shares of common stock.

46.     In its Schedule 14C dated May 12, 2020 and filed with the SEC, in the section titled

"Interest of Certain Persons in Favor of or Opposition To Matters Acted Upon"

Defendant Shiftpixy states "Our Chief Executive Officer, Scott W. Absher, will benefit

from the adoption of the Action as he owns 12,500,000 options to purchase shares of

Preferred Stock and will be able to convert such Preferred Stock into our common stock."

See Defendant Shiftpixy's Schedule 14C dated May 12, 2020, attached hereto as **Exhibit**

**"J"**.

47.     Defendant Shiftpixy's Amended and Restated Articles of Incorporation dated March 20,

2020, at Article IX, provides, in relevant part as follows:

> **D.      Conversion: The holders of the Preferred Stock will have the right to
> convert their Preferred Stock at any time into shares of Common at
> the conversion ratio of one (1) share Preferred Class A Stock to one
> (1) Common Shares of Stock.**
>
> **E.      Certain Antidilution Protection: There shall be antidilution protection
> afforded the Preferred Stock solely for the proportional adjustment
> resulting from stock splits, stock dividends, recapitalizations and the
> like, but not for other matters such as additional stock issuances or
> price adjustments**

See Defendant Shiftpixy's Schedule 14C dated May 12, 2020, at Appendix A, pg. A-4,

attached hereto as **Exhibit "J"**.

48.     On June 4, 2020, Defendant Absher exercised 12,500,000 Preferred Options to purchase

12,500,000 shares of the Company's preferred stock, par value $0.0001 per share, for

$0.0001 per share (a total of $1,250), and immediately following the exercise of the

Preferred Options and in accordance with the Amended and Restated Articles of

Incorporation dated March 20, 2020 which for the first time outlined conversion rights

for Preferred Stock, Defendant Absher converted the 12,500,000 shares of Preferred

Stock into 12,500,000 shares of Shiftpixy common stock.

49.    Thus, Absher purchased 12,500,000 shares at this sub-penny price thereby diluting other

public shareholders to 4.8% of the outstanding shares of Common Stock of Shiftpixy, and

as a result thereof, Defendant Absher effectively took over Defendant Shiftpixy.[9]

50.    The Sub-Penny Share Issuance triggered a reset in Diamond's warrants pursuant to the

express terms of the anti-dilution provisions contained in the Form of Warrant, as

outlined more fully above.

51.    Defendant Absher and Shiftpixy undertook the foregoing actions, and either knew or

should have known of the full-ratchet anti-dilution price protection provisions contained

in the Diamond Warrants, and the consequences thereof.

**Plaintiff Diamond's Demands for the Diamond Warrants**

52.    In or around March /April of 2020, Plaintiff Diamond realized that Defendant Shiftpixy

never delivered the Diamond Warrants[10] included in Defendant Shiftpixy's Amended S-3

filed on April 29, 2019.

---

[9]Prior to the Sub-Penny Share Issuance, Shiftpixy disclosed that there were 1,220,197 shares of Common Stock issued and outstanding. See Schedule 14C Information Statement dated May 12, 2020, at pg. 4, attached hereto as **Exhibit "J"**.

[10]As allowed for and provided in Section 2(c) of the Investment Banking Agreement, Drexel Hamilton provided instruction to Defendant Shiftpixy that the 67,285 Warrants due to Drexel Hamilton and outlined in Defendant ShiftPixy's Amended S-3 dated April 29, 2019 should be issued directly to Plaintiff Diamond.

53.   By May 21, 2020, after several verbal demands for delivery of the Diamond Warrants,

Plaintiff Diamond emailed Defendant Shiftpixy's Chief Financial Officer, Dominic

Carey, demanding delivery of the warrants to which he was entitled, citing to the

full-ratchet anti-dilution price protection provisions contained in the Form of Warrant

attached to Defendant Shiftpixy's Form 8-K dated March 12, 2019, Form S-3 dated April

1, 2019, and Amended Form S-3 dated April 29, 2019, stating in relevant part as follows:

**"As discussed several times over the last few weeks my firm is owed warrants from the bridge deal completed in March 2019.  We are aware that a subsequent reverse split has occurred, however, due to the recent approval of the issuance of over 12 million options to the Chief Executive Officer at par value our warrants are subject to ratchet provisions which would technically mean we are owed billions of shares.."**

See May 21, 2020 email from Plaintiff Diamond to Domonic Carney (email chain

redacted to exclude settlement communications), attached hereto as **Exhibit "K"**.

54.   Despite Plaintiff Diamond's repeated verbal and written requests/demands for delivery of

the Diamond Warrants, adjusted in accordance with the anti-dilution provisions of the

warrant for the Sub-Penny Share Issuance, Defendant Absher responded on the same date

stating in part "You should lawyer up...See you in Court".   See **Exhibit "K"** attached

hereto.

55.   To date, Defendant Shiftpixy has failed and refused to deliver to Plaintiff Diamond the

Diamond Warrants, adjusted in accordance with the anti-dilution provisions of the

warrant for the Sub-Penny Share Issuance, as provided for and clearly acknowledged in

Defendant Shiftpixy's Amended Form S-3 dated April 29, 2019, which Drexel Hamilton

earned and assigned to Plaintiff Diamond under the Investment Banking Agreement.

**Following the Reverse Stock Split, the Vensure Asset Sale, the May 2020 Public Offering, and Conversion of Defendant Absher's Preferred Shares and Sub-Penny Share Issuance, and As Result of the Full-Ratchet Anti-dilution Price Protection Provisions, Plaintiff Diamond is Now Entitled to More than a Billion Warrants that Shiftpixy has Failed and Refused to Deliver**

56.    Per the terms of the Investment Banking Agreement and Form of Warrant attached to

Defendant Shiftpixy's Form 8-K dated March 12, 2019, Form S-3 dated April 1, 2019,

and Amended Form S-3 dated April 29, 2019 which unequivocally includes full-ratchet

anti-dilution price protection provisions, and as a result of Defendant Shiftpixy's Reverse

Stock Split, the Amendment to Shiftpixy's Articles of Incorporation, the Vensure Asset

Sale, the May 2020 Public Offering, and Defendant Absher's Preferred Stock Conversion

and resulting Sub-Penny Share Issuance (collectively referred to as the "Dilutive

Events"), Plaintiff Diamond (as Assignee of Drexel Hamilton) is owed 1,179,971,980

Warrants (the "Post Split/Post Sub-Penny Issuance Warrants") based on the following

formula outlined in the Form of Warrant:

1685 (the number of Warrants to Which Diamond was entitled after the Reverse Stock
Split) ÷ 0.000001428 ($0.0001 which is the exercise price for Absher's Conversion of
Preferred to Common Stock ÷ $70 which is the Strike Price after the Reverse Split) =
**1,179,971,980 Diamond Post Split/Post Sub-Penny Issuance Warrants**

## COUNT I - SPECIFIC PERFORMANCE
### (As Against Defendant Shiftpixy)

57.    Plaintiff repeats and re-alleges the allegations made in the foregoing paragraphs as if they

were fully set forth herein.

58.    Pursuant to the Investment Banking Agreement, Amended S-3 and Plaintiff's repeated

written demands, and as a result of Defendant Shiftpixy's Reverse Stock Split,

Amendment to Articles of Incorporation, the Vensure Asset Sale, the May 2020 Public Offering and/or the Absher Preferred Stock Conversion and Issuance of Sub-Penny Shares, Plaintiff Diamond (as Assignee of Drexel Hamilton) is owed the Post Split/Post Sub-Penny Issuance Warrants.

59.     Despite its clear and unambiguous contractual obligation to do so, Defendant Shiftpixy has repudiated its contractual obligations and failed and/or refused to deliver the Post Split/Post Sub-Penny Issuance Warrants due and owing to Plaintiff Diamond, as outlined more fully above.

60.     As a result of such failure and refusal by Defendant Shiftpixy, Plaintiff Diamond has suffered damages, has no adequate remedy at law, and in the absence of specific performance, will suffer irreparable harm.

61.     Plaintiff Diamond requests, therefore, that the Court enter an order of specific performance directing and requiring Defendant Shiftpixy to immediately deliver to Plaintiff Diamond the Post Split/Post Sub-Penny Issuance Warrants, and to immediately honor a subsequent Exercise Notice therefor.

## COUNT II- BREACH OF CONTRACT
### (As Against Defendant Shiftpixy)

62.     Plaintiff repeats and re-alleges the allegations made in foregoing paragraphs as if they were fully set forth herein.

63.     The Investment Banking Agreement is a valid and enforceable contract.

64.     Drexel Hamilton performed all of its obligations under the Investment Banking Agreement, it introduced Defendant Shiftpixy to investors which provided the March

35

2019 Bridge Financing that closed on March 11, 2019 which resulted in Drexel Hamilton

being owed Warrant placement fees of 67, 285 Warrants that were assigned to Plaintiff

Diamond as permitted by the Investment Banking Agreement, and registered per

Defendant Shiftpixy's Amended S-3 dated April 24, 2019.

65.    As a result of Defendant the Dilutive Events, including, but not limited to, Shiftpixy's

Reverse Stock Split, Amendment to Articles of Incorporation, and the Absher Preferred

Stock Conversion and Issuance of Sub-Penny Shares, and pursuant to the clear

antidilution provisions contained in the Form of Warrant Plaintiff Diamond (as Assignee

of Drexel Hamilton) is owed the Post Split/Post Sub-Penny Issuance Warrants.

66.    Defendant Shiftpixy's failure and refusal to deliver said Post Split/Post Sub-Penny

Issuance Warrants to Plaintiff Diamond, constitutes a repudiation and breach of the

Investment Banking Agreement and Form of Warrant attached to Defendant Shiftpixy's

Amended S-3 dated April 24, 2019.

67.    Defendant Shiftpixy entered into the Investment Banking Agreement and agreed to abide

by the terms thereof.

68.    Implied in those contractual relationships were Defendant Shiftpixy's covenants of good

faith and fair dealing.

69.    By refusing to honor the Investment Banking Agreement and failing to deliver the Post

Split/Post Sub-Penny Issuance Warrants owed thereunder as placement fees, Defendant

Shiftpixy has breached its contract and has deprived Plaintiff Diamond of the

agreed-upon consideration it bargained for pursuant to the Transaction.

70.    Defendant Shiftpixy's actions have also breached the implied covenant of good faith and

fair dealing and have caused (and continue to cause) Plaintiff Diamond harm and damages.

71. By reason of the foregoing, Defendant Shiftpixy is liable to Plaintiff Diamond for direct and consequential damages in an amount to be determined at trial, but not less than the value of the Post Split/Post Sub-Penny Issuance Warrants, that Plaintiff Diamond is unable to exercise due to Defendant Shiftpixy's conduct.

## COUNT III -BREACH OF FIDUCIARY DUTY
### (As Against Defendant Absher)

72. Plaintiff repeats and re-alleges the allegations made in foregoing paragraphs as if they were fully set forth herein.

73. As an Officer and Director and person in control of Shiftpixy, Defendnat Absher owes fiduciary duties to the shareholders of Shiftpixy, including Plaintiff Diamond; these include duties of due care and a duty of loyalty.

74. As outlined above, Defendant Absher breached his duties of loyalty and due care by not acting in the best interest of Shiftpixy, but rather acting in bad faith and for his own personal and corporate interests.

75. Defendant Absher breached his duties of loyalty and due care and did not act in good faith with respect to Plaintiff Diamond by:

(a) taking de facto control of Shiftpixy through the Amendment to the Articles of Incorporation and Sub-Penny Issuance;

(b) actively filing false and misleading forms and statements with the SEC stating that **all March 2019 Warrants** which previously included full-ratchet anti-dilution price protection were amended, cancelled or exercised for shares of common stock which did not contain full-ratchet anti-dilution price protections, See **Exhibit "L"**, at Prospectus Summary, pg. 3 in the section titled "Convertible Note Settlements";

(c) failing to deliver the Post Split/Post Sub-Penny Issuance Warrants to Plaintiff Diamond, despite repeated requests therefor;

(d) failing to properly record the Post Split/Post Sub-Penny Issuance Warrants on the books and records of the corporation;

(e) diluting the Shiftpixy common stock shareholders for inadequate and/or no consideration;

(f) causing Shiftpixy to issue shares to himself and another controlling shareholder without adequate and/or no consideration

(g) managing Shiftpixy for his own benefit and to the detriment of Shiftpixy's other shareholders;

(h) grossly mismanaging Shiftpixy, with reckless disregard for the interests of Shiftpixy; and

(i) acting to deprive Plaintiff Diamond of his interest in Shiftpixy.

76.     As a direct and proximate result of Defendant Absher's breaches of his fiduciary duties, wrongful acts and omissions, more fully detailed above, Plaintiff Diamond has not received the Post Split/Post Sub-Penny Issuance Warrants, and has suffered significant damages.

## COUNT IV -TORTIOUS INTERFERENCE WITH CONTRACT
### (As Against Defendant Absher)

77.     Plaintiff repeats and re-alleges the foregoing paragraphs as if they were fully set forth herein.

78.     The Investment Banking Agreement constitutes a valid and enforceable contract.

79.     Plaintiff Diamond is an express third party beneficiary of that contract pursuant to section 2(c) thereof.

80.      Defendant Absher executed the Investment Banking Agreement on behalf of Defendant

38

Shiftpixy and therefor had knowledge of thereof.

81.   Defendant Absher, aided by Shiftpixy's lawyers and accountants, through wrongful and tortious conduct procured a breach of the Investment Banking Agreement by directing and instructing Defendant Shiftpixy to refuse to deliver the Post Split/Post Sub-Penny Issuance Warrants due thereunder.

82.   Upon information and belief, Defendant Absher through wrongful and tortious conduct has prevented Defendant Shiftpixy from complying with the terms of the Investment Banking Agreement.

83.   Defendant Absher's tortious conduct was carried out for his own personal financial interest and benefit, and not in the interests of Defendant Shiftpixy or its shareholders.

84.   As a result of Defendant Absher's intentional and tortious conduct, Defendant Shiftpixy has breached the Investment Banking Agreement by failing and refusing to deliver the Post Split/Post Sub-Penny Issuance Warrants due and owing to Plaintiff Diamond.

85.   As a result of Absher's intentional and tortious conduct causing and resulting in Defendant Shiftpixy 's breach of the Investment Banking Agreement, Plaintiff Diamond has suffered significant damages.

86.   By reason of the foregoing, Defendant Absher is liable to Plaintiff Diamond for direct and consequential damages in an amount to be determined at trial, but not less than the value of the Post Split/Post Sub-Penny Issuance Warrants that Plaintiff Diamond is unable to exercise due to Defendant Shiftpixy's conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its

favor as follows:

A.  An order of specific performance directing and requiring (1) Defendant Shiftpixy
    to immediately deliver to Plaintiff Diamond the 1,179,971,980 Post Split/Post
    Sub-Penny Issuance Warrants pursuant to the Investment Banking Agreement and
    Amended S-3, and (2) the Transfer Agent to immediately issue share certificates
    (or create a book entry on the stock register of Defendant Shiftpixy with the
    Transfer Agent, as applicable) or credit 1,179,971,980 Shares to the applicable
    balance accounts at The Depository Trust Company, registered in the name of
    Plaintiff Diamond, for the Post Split/Post Sub-Penny Issuance Warrants.

B.  An order of specific performance directing and requiring that (a) following
    delivery of the Post Split/Preferred Conversion Warrants, Defendant Shiftpixy
    immediately honor a subsequent Exercise Notice therefore, and (2) the Transfer
    Agent immediately issue certificates (or create a book entry on the stock register
    of Defendant Shiftpixy with the Transfer Agent, as applicable) or credit
    1,179,971,980 Shares to the applicable balance accounts at The Depository Trust
    Company, registered in the name of Plaintiff Diamond , for 1,179,971,980 Shares
    deliverable pursuant to the Warrant.

C.  An award of monetary damages against the Defendants, including direct and
    consequential damages, jointly and severally, in an amount to be determined at
    trial.

D.  An award for Plaintiff Diamond's costs and expenses incurred in prosecuting this
    action and in enforcing and/or collecting upon the Warrants, including, without

40

limitation, reasonable attorneys' fees, costs and disbursements.

F.      For such other further relief as the Court may deem just, proper, and in the

interest of justice.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Rackwise

respectfully demands a jury trial of all issues triable to a jury in this action.


Respectfully submitted,

ALAN L. FRANK LAW ASSOCIATES, P.C.

Alan L. Frank, Esquire
Attorney Bar Code# 4211744
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

45 Broadway, Suite 720
New York, NY 10006
Attorneys for Plaintiff Jason Diamond

Dated: September 8, 2020