UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                      :

JASON DIAMOND,
                                                      :

                   Plaintiff,                        :

                                                      :            20-cv-7305 (LJL)

          -v-                                  :

                                                      :        OPINION AND ORDER

SHIFTPIXY, INC. and SCOTT ABSHER,
                                                        :

                   Defendants.                   :

                                                          :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants ShiftPixy Inc. ("ShiftPixy") and Scott Absher ("Absher," and together

"Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6), to dismiss the

complaint filed by Plaintiff Jason Diamond ("Diamond" or "Plaintiff") against them.

      For the following reasons, the motion to dismiss the claims against ShiftPixy and against

Absher is granted.

**BACKGROUND**

I.      **The Parties**

      Defendant ShiftPixy is a specialized staffing and human capital management service

provider.  Dkt. No. 1 ("Complaint" or "Compl.") ¶ 3.  It provides solutions for large contingent

part-time workforce demands, primarily in the restaurant, hospital, and maintenance service

trades.  *Id.*  ShiftPixy is a Wyoming corporation with its principal place of business in California.

*Id.*

      Defendant Absher has been the CEO and a director of ShiftPixy at all relevant times.  *Id.*

¶ 4.  He is a citizen and resident of California.  *Id.*

Plaintiff Diamond is a citizen and resident of Washington. *Id.* ¶ 2. Diamond was an employee of, and head of investment banking with, a registered broker-dealer named Drexel Hamilton ("Drexel"), which served as financial advisor to ShiftPixy. *Id.* ¶ 1; *see* Dkt. No. 18-1 (Diamond's signature on the transaction agreement as head of investment banking at Drexel).[1]

## II.     The Investment Banking Agreement

On September 26, 2018, ShiftPixy and its subsidiaries and affiliates entered into an Exclusive Investment Banking Agreement ("IBA") with Drexel, and another firm named Stifel, Nicolaus & Company, Incorporated ("Stifel"). Compl. ¶ 9; *see also* Dkt. No. 18-1 (the IBA). The IBA provided for Stifel and Drexel Hamilton to act as ShiftPixy's "exclusive financial advisors and placement agents in connection with one or more capital raises (each a 'Transaction')." Dkt. No. 18-1 at 1.

The IBA promised placement fees to each of Drexel and Stifel if ShiftPixy entered into a definitive agreement with an Investor with respect to a Transaction or consummated a Transaction with any Investor based upon the Transaction. Those fees took the form of both cash and a warrant. Specifically, Section 2 of the IBA discusses "compensation" and provides:

> If during the Term or Tail Period (as defined in Section 9) of this Agreement, the Company enters into a definitive agreement with an Investor with respect to a Transaction or consummates a Transaction with any Investor, [ShiftPixy] agrees to

---

[1] In reviewing a Rule 12(b)(6) motion, the court may consider the following materials: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 352 n.1 (S.D.N.Y. 2008). There is no dispute that the IBA is "integral and relied upon" in the Complaint.

pay Stifel and Drexel Hamilton the following fees on the closing date of each such Transaction:

B. <u>Cash Placement Fees.</u>

     i. 7.5% of the gross proceeds paid for any equity or equity-linked securities issued by [ShiftPixy] (including, without limitation, any debt plus warrant structure); and

    ii. 3.75% of the face value of any non-convertible or non-equity-linked debt facility or committed line of credit, including any undrawn but committed amounts (excluding any debt plus warrant structure), dividing by the exercise price.

C. <u>Warrant Placement Fees.</u>

     i. A number of warrants equal to 6.0% of the gross proceeds paid for any equity or equity-linked securities issued by [ShiftPixy] (including, without limitation, any debt plus warrant structure);

    ii. A number of warrants equal to 3.0% of the face value of any non-convertible or non-equity-linked debt facility or committed line of credit, including any undrawn but committed amounts (excluding any debt plus warrant structure), divided by the exercise price.

The Warrants shall have a term of five-years, contain cashless exercise provisions and piggyback registration rights, providing the Agents with the right to purchase one share of [ShiftPixy]'s common stock per Warrant with an exercise price equal to (a) the implied per share valuations received by participating investors in the Transaction, or (b) in the event of no valuation mechanism in the Transaction, an exercise price equal to 110% of the 10-day VWAP [volume weighted average price] for the 10-day period immediately preceding the closing of the Transaction (the "Exercise Price").

Each of Stifel and Drexel Hamilton shall receive 50% of each of the case placement fee set forth in Section 2(B) and the warrant placement fee set forth in Section 2(C). At each Agent's option and upon such Agent's written instructions to the Company, the Company shall issue all or a portion of any warrants due to such Agent under this Agreement directly to specified employees of such Agent.

*Id.* § 2.

The IBA defines "Agent" as either Stifel or Drexel. *Id.* at 1. It defines "Investors" as "persons or entities (and their affiliates) introduced by the Agents to [ShiftPixy]," "persons or entities (and their affiliates) introduced by [ShiftPixy] to the Agents during the Term of this Agreement[,] and any person or entity (and their affiliates that seeks to enter into, or actually enters into any Transaction with [ShiftPixy] during the Term of this Agreement." *Id.* § 1(c). The IBA defines "Term" as the twelve-month anniversary of its date. *Id.* § 8.

Aside from the terms set forth in Section 2C, the IBA contains no provision defining the required terms of the warrants. It does not require Defendants to include with the warrants any anti-dilution provisions or full-ratchet anti-dilution. *See* Dkt. No. 18 at 8; Dkt. No. 24 at 1 (acknowledging that the IBA "does not otherwise define or describe the terms of the warrants to be issued as part of the placement fees").[2] Drexel and Stifel's protection is in the ability, upon issuance, to immediately convert the warrants into common stock.

The IBA also contains an integration and non-modification clause under Section 15, which provides:

> This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements, both written and oral, with respect to the subject matter hereof, and no modification of this Agreement or waiver of the terms and conditions contained herein shall be binding upon the parties hereto unless approved in writing by each party.

Dkt. No. 18-1 § 15.

The IBA contains a forum selection clause and consent to provision jurisdiction clause under Section 16:

> All aspects of the relationship created by this Agreement or the engagement hereunder, any other agreements relating to the engagement hereunder and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the engagement hereunder shall be governed by and construed in accordance with the laws of the State of New York,

---

[2] Plaintiff defines anti-dilution as follows: "Anti-dilution provisions act as a buffer to protect investors against their equity ownership positions becoming diluted or less valuable. This can happen when the percentage of an owner's stake in a company decreases because of an increase in the total number of shares outstanding. Total shares outstanding may increase because of new share issuance based on a round of equity financing. Dilution can also occur when holders of stock options, such as company employees, or holders of other optionable securities exercise their options. . . . The two common types of anti-dilution clauses are known as 'full ratchet' and 'weighted average'. With a full ratchet provision, the conversation price of the existing preferred shares is adjusted downward to the price at which new shares are issued in later rounds. Very simply, if the original conversion price was $5 and in a later round the conversion price is $2.50, the investor's original conversion price would adjust to $2.50." Compl. ¶ 20 n.8 (quoting Will Kenton, *Anti-Dilution Provision*, Investopedia (Oct. 17, 2020), https://www.investopedia.com/terms/a/anti-dilutionprovision.asp.)

applicable to contracts made and to be performed therein and, in connection therewith. The parties consent to the exclusive jurisdiction of the courts located in New York County, New York, in connection with any claim or dispute relating to this Agreement or any services or advice provided hereunder. The prevailing party in any such litigation shall be entitled to recover its attorney's fees and costs. Notwithstanding the foregoing, solely for purposes of enforcing [ShiftPixy]'s obligations under Annex A or Annex B, [ShiftPixy] consents to personal jurisdiction, service and venue in any court proceeding in which any claim or cause of action relating to or arising out of this agreement or the engagement hereunder is brought by or against any Indemnified Person.

*Id.* § 16.

Diamond signed the IBA on behalf of Drexel as its head of investment banking, John Lanza ("Lanza") signed on behalf of Stifel as its managing director, and Absher signed on behalf of ShiftPixy as its CEO. *Id.* at 13.

## III. The Securities Purchase Agreement

In March 2019, Drexel, through Diamond, introduced ShiftPixy to institutional investors who could provide it bridge financing. Compl. ¶ 11. On March 11, 2019, during the term of the IBA, ShiftPixy entered into a Securities Purchase Agreement ("SPA") with institutional investors introduced to it by Drexel for the sale and issuance by ShiftPixy of $4.75 million of senior convertible notes (the "Notes") due September 12, 2020. *Id.* ¶ 12. Concurrently with the sale of the Notes, pursuant to the SPA, ShiftPixy agreed to issue and sell to the same investors immediately exercisable warrants to purchase 2,840,909 shares of its common stock at an exercise price of $1.75 per share (subject to adjustments provided under the terms of the warrants). *Id.* Specifically, the SPA required ShiftPixy to sell and each of the institutional investors to buy a Note in the aggregate original principal amount set forth in a schedule to the SPA and "a warrant to initially acquire up to that aggregate number of additional shares of Common Stock set forth opposite such Buyer's name [on a schedule to the SPA], substantially in the form [of Exhibit B attached to the SPA]." Dkt. No. 18-2 § C. The parties agree that the

Form of Warrant contained a full-ratchet anti-dilution provision that would "adjust the exercise price of a warrant so that the holder of the warrant is protected against dilution by reason of subsequent share issuances or other triggering events." Dkt. No. 18 at 5. Specifically, the Form of Warrant provided, in part:

2. ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES. The Exercise Price [(i.e., $1.75)] and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time as set forth in this Section 2.

(a) Stock Dividends and Splits. Without limiting any provision of Section 2(b), Section 3 or Section 4, if [ShiftPixy], at any time on or after the Subscription Date, (i) pays a stock dividend on one or more classes of its then outstanding shares of Common Stock or otherwise makes a distribution on any class of capital stock that is payable in shares of Common Stock, (ii) subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its then outstanding shares of Common Stock into a larger number of shares or (iii) combines (by combination, reverse stock split or otherwise) one or more classes of its then outstanding shares of Common Stock into a smaller number of shares, then in each such case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to clause (i) of this paragraph shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution, and any adjustment pursuant to clause (ii) or (iii) of this paragraph shall become effective immediately after the effective date of such subdivision or combination. If any event requiring an adjustment under this paragraph occurs during the period that an Exercise Price is calculated hereunder, then the calculation of such Exercise Price shall be adjusted appropriately to reflect such event.

(b) Adjustment Upon Issuance of Shares of Common Stock. If and whenever on or after the Subscription Date, [ShiftPixy] issues or sells, or in accordance with this Section 2 is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "New Issuance Price") less than a price equal to the Exercise Price in effect immediately prior to such issuance or sale or deemed issuance or sale (such Exercise Price then in effect is referred to herein as the "Applicable Price") (the foregoing a "Dilutive Issuance"), then immediately after such Dilutive Issuance, the Exercise Price then in effect shall be reduced to an amount equal to the New Issuance Price.

Dkt. No. 1-2 §§ 2(a)-(b).

It also provided that: "Simultaneously with any adjustment to the Exercise Price pursuant to this Section 2, the number of Warrant Shares that may be purchased upon exercise of this Warrant shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment (without regard to any limitations on exercise contained herein)." *Id.* § 2(c).

The SPA contains a number of other provisions protecting the value of the Notes and the Warrants. It requires ShiftPixy to have "reserved from its duly authorized capital stock not less than 200% of" the maximum number of shares issuable upon conversation of the notes and exercise of the warrants. Dkt. No. 18-2 § 3(c). It sets forth the "fees and expenses" of Drexel and Stifel as Placement Agents to be paid by the Company in connection with the sale of the Securities. *Id.* § 3(g). The placement fees are calculated as 7.5% of gross proceeds or $281,250 split 50/50 between Stifel and Drexel. *Id.*, Schedule 3(g). The SPA contains ShiftPixy's presentation that there are no outstanding warrants "[e]xcept as disclosed in the SEC Documents." *Id.* § 3(r)(iv). It contains a covenant on the "Additional Issuance of Securities" preventing ShiftPixy, without the prior written consent of what the SPA defines as the "Required Holders,"[3] from issuing any other securities that would cause a breach or default or default under the Notes or Warrants "[s]o long as any Buyer beneficially owns any Notes or Warrants" and also preventing ShiftPixy from issuing any right to purchase any equity security during a

---

[3] "Required Holders" is defined to mean "(I) prior to the Closing Date, each Buyer entitled to purchase Notes at the Closing and (II) on or after the Closing Date, holders of a majority of the Registrable Securities as of such time (excluding any Registrable Securities held by the Company or any of its Subsidiaries as of such time) issued or issuable hereunder or pursuant to the Notes and/or the Warrants." Dkt. No. 18-2 § 9(e).

specified period following the registration of the shares to which the buyers will be entitled.  *Id.* § 4(k).

The SPA is signed by each of the four buyers.  *See id.*  It also is signed by Asher as CEO of ShiftPixy.  It is not signed by Drexel or Stifel and they are not parties to it.

 The March 2019 Bridge Financing closed on or about March 12, 2019.  Compl. ¶ 13. ShiftPixy received aggregate gross proceeds of approximately $3.75 million in this offering (the "March 2019 Bridge Financing").  *Id.* ¶ 12.[4]

In connection with this transaction, ShiftPixy issued a Form 8-K dated March 12, 2019. That 8-K described that "[o]n March 11, 2019, ShiftPixy . . . entered into a [SPA] with certain institutional investors . . . for the sale and issuance by the Company of $4,750,000 of Senior Convertible Notes due September 12, 2020" and that "[c]oncurrently with the sale of the Notes [and] pursuant to the [SPA], ShiftPixy intend[ed] to issue and sell warrants to purchase 2,840,909 shares of our common stock (the 'Warrants') . . . [which] will be immediately exercisable and will expire on March 12, 2024."  Dkt. No. 1-1 at 2.  The 8-K further stated: "The Warrants will have an exercise price equal to $1.75 per share of our common stock, subject to adjustments as provided under the terms of the Warrants."  *Id.*  The 2,840,909 figure corresponds to the number of shares reflected in the SPA.

The 8-K further stated:

> We may not issue any shares of our common stock upon conversion of the Existing Notes (as amended), upon conversion of the Notes or exercise of the Warrants or otherwise, if any such issuances would, in the aggregate, exceed 20% of the total outstanding shares of our common stock, until we obtain the approval of our stockholders. If we fail to obtain the approval of its stockholders within the time

---

[4] Although the face amount of the Notes was $4.75 million, they were issued at a discounted price.  *See* Dkt. No. 18 at 5; Dkt. No. 18-2, "Schedule of Buyers."

required by Purchase Agreement, we must pay any conversions of the Note and Exercise of the Warrants in cash.

*Id.*[5]  It concluded: "We will pay cash, issue warrants, and reimburse expenses to placement agents for the transactions described herein."  *Id.*  Notably, the warrants referred to in connection with the placement agent fee were not a defined term.  The 8-K states "[t]he final forms of all documents described above are filed as Exhibits to this report" and it attaches the Securities Purchase Agreement, the Form of Senior Convertible Note, and a "Form of Warrant."  *See* Dkt. No. 1-2.

The Form of Warrant attached to the 8-K bears the legend Ex. B from the SPA.  It also bears the exhibit number from the 8-K.  It contains the language also reflected in the Form of Warrant attached to the SPA:

> This Warrant is one of the Warrants to Purchase Common Stock (the "SPA Warrants') issued pursuant to Section 1 of that certain Securities Purchase Agreement, dated as of March 11, 2019 (the "Subscription Date"), by and among [ShiftPixy] and the investors (the "Buyers") referred to therein, as amended from time to time (the "Securities Purchase Agreement").

Dkt. Nos. 1-2, 1-4, 1-7.

## IV.  Subsequent Form S-3 Filings

The SPA gave the buyers registration rights, *see* Dkt. No. 18-2 at § C, and the IBA gave Drexel and Stifel piggyback registration rights, *see* Dkt. No. 18-1 § 2(C).[6]  On April 1, 2019, ShiftPixy filed its Registration Statement on Form S-3 with the SEC, registering the shares

---

[5] "Existing Notes" are defined as 8% Senior Secured Convertible Notes Due September 4, 2019 and 8% Senior Secured Convertible Notes Due December 31, 2019.  Dkt. No. 1-1 at 3.

[6] "Piggyback registration rights are a form of registration rights that grants the investor the right to register their unregistered stock when either the company or another investor initiates a registration."  James Chen, *Piggyback Registration Rights*, Investopedia (Mar. 30, 2021), https://www.investopedia.com/terms/p/piggybackrights.asp.

issuable upon the repayment and/or conversion of the Notes and issuable upon the exercise of both the warrants issued to both the Buyers and to Stifel and Drexel.  Dkt. No. 1-3.

The "selling shareholders" were identified as Alpha Capital Anstalt, CVI Investments, Inc., Dominion Capital, LLC, Osher Capital Partners, LLC, and Drexel.  *Id.* at 35.  Unlike in the 8-K, the reference to Warrants in the S-3 referred to both the Warrants issued pursuant to the SPA and those issued pursuant to the IBA.  It stated that the prospectus related to the sale "of up to 36,412,207 shares of our common stock . . . 5,767,046 shares of which are issuable upon exercise of certain outstanding common stock purchase warrants (the 'Warrants'), all issued by us to the selling shareholders on March 12, 2019."  *Id.* at 3.  It contained a further breakdown of the shares issuable upon exercise of the Warrants: "5,681,818 shares of Common Stock issuable upon exercise of Warrants granted to certain selling shareholders at an exercise price of $1.75 per share, and 85,228 shares of Common Stock issuable upon exercise of Warrants granted to Drexel Hamilton, LLC, in its role as advisor, at an exercise price of $1.75 per share, but subject to a right of cashless exercise."  *Id.* at 6; *see also id.* at 2 n.1.

Finally, under a section entitled, "The March 2019 Financing Transaction," the Form S-3 described the March 2019 Bridge Financing as resulting in the issuance of 2,840,909 warrants, which were defined as the "March Warrants."  *Id.* at 14.  It then said that additional warrants were "issued to Drexel Hamilton as it [sic] role as advisor" which were "exercisable on a cashless basis without any conditions."  *Id.*  The definition of the "March Warrants" does not include the warrants issued to Drexel:

> **Warrants to purchase up to an aggregate of 2,926,137 shares of Common Stock**.  In connection with the issuance of the March Notes, a total of 2,840,909 Warrants (the 'March Warrants') were issued to the selling shareholders that (a) have an initial exercise price of $1.75 per share (subject to adjustment as set forth therein), (b) become exercisable at any time on or after March 12, 2019, and on or prior to March 12, 2024, (c) contain certain ownership limitations that may restrict

their exercise, as described under the caption "Selling Shareholders" in this prospectus, and (d) are exercisable on a cashless basis if at the time of exercise there is no effective registration statement registering, or the prospectus contained therein is not available for, the resale of shares of Common Stock for which the March Warrants are exercisable. Warrants to purchase a total of 85,228 shares of Common Stock, were issued to Drexel Hamilton as it[s] role as advisor, are exercisable on a cashless basis without any conditions. The registration statement of which this prospectus is a part is not registering the offer or sale of any of the March Warrants

*Id*.

The Form S-3 incorporated by reference the Form 8-K. It also attached the Form of Warrant from the 8-K dated March 12, 2019. *See id.*; Dkt. No. 1-4.

On April 21, 2019, ShiftPixy through its CFO Patrice Launay ("Launay") informed Plaintiff that he believed a calculation error had been made for the warrants owed to Drexel and included in the April 1, 2019 Form S-3 and that rather than the 85,228 warrants listed in the Form S-3, Drexel was entitled to only 67,285 warrants based on 6% of the $3.75 million in gross proceeds from the 2019 March Bridge Financing. Diamond agreed on behalf of Drexel. Dkt. No. 1-5; Compl. ¶¶ 22-23.

Accordingly, ShiftPixy filed an Amended Form S-3, dated April 29, 2019. *See* Dkt. No. 1-6; Compl. ¶ 24. The Amended Form S-3 reflected the correct number of shares owned by Drexel: "5,681,818 shares of our Common Stock issuable upon exercise of Warrants granted to certain selling shareholders at an exercise price of $1.75 per share, and 67,285 shares of our Common Stock issuable upon exercise of Warrants granted to Drexel Hamilton, LLC, in its role as advisor, at an exercise price of $1.75 per share, but subject to a right of cashless exercise." Dkt. No. 1-6 at 6; *see also id.* at 2 n.1.

The Amended Form S-3 also incorporated by reference and attached the Form of Warrant from the 8-K dated March 12, 2019. *See id.*; Dkt. No. 1-7.

As in the Form S-3, the Amended Form S-3 described the warrants that Drexel received—warrants to purchase a total of 67,285 shares of common stock—as separate from the 2,840,909 warrants issued to shareholders in connection with the issuances of the Notes in March. Dkt. No. 1-6 at 15. The March Warrants are defined as the 2,840,909 warrants issued to the selling shareholders. The warrants issued to Drexel are discussed separately in the next sentence as separate and apart from the March Warrants: "Warrants to purchase a total of 67,285 shares of Common Stock, were issued to Drexel Hamilton in its role as advisor, are exercisable on a cashless basis without any conditions." *Id.*

Unlike the Form S-3, however, the Amended Form S-3 contains a discussion of anti-dilution protections, specifically and only in connection with the $4.75 million offering of the Notes:

> Amounts due and owing under the March Notes are convertible into shares of our common stock at an initial conversion price of $1.67 (the 'initial conversion price'). The March Notes contain anti-dilution protection provisions for the lenders whereby the initial conversion price will be adjusted downward upon the occurrence of any one of more [sic] of the following events if such events are for a consideration per share lower than $1.67 (a 'dilutive issuance'). However, the conversion price of the March Notes may never be lower than $0.31 per share (the 'floor price').

*Id.* at 14.

## V.     The ShiftPixy Reverse Stock Split

On November 12, 2019, ShiftPixy's board of directors and a majority of shareholders authorized a "1 for 40" reverse stock split of ShiftPixy's issued and outstanding common stock, effective on December 16, 2019. Compl. ¶ 29; Dkt. Nos. 1-8, 1-9.

Prior to the stock split, ShiftPixy had 750 million shares of common stock authorized and 35,723,762 shares of common stock issued and outstanding. Dkt. No. 1-9 at 4. Following the

reverse split, the number of shares of common stock issued and outstanding declined from 35,723,762 shares to 893,095 shares.  *Id.*

## VI.    The 2019 and 2020 Exchange and Settlement Transactions

Between December 5, 2019 and March 24, 2020, ShiftPixy entered into a series of settlements, agreed upon note conversions, note exchanges, and principal repayments (the "Convertible Note Settlements") including for "all of [ShiftPixy's] warrants issued in connection with the March 2019 Notes (the 'March 2019 Warrants') that previously included full-ratchet anti-dilution price protection."  Dkt. No. 1-12 at 3.

The effect of those transactions, which were conducted with the consent of the majority of the four buyers in the March 2019 transaction, was to remove the full-ratchet anti-dilution protection to which the buyers were entitled in that transaction and to substitute for it new warrants (which did not contain anti-dilution provisions) to purchase shares of common stock at an exercise price of $10.17 per share.  *See* Compl. ¶ 34.  Plaintiff contends that no such settlement, amendment, cancellation, or issuance of new warrants was executed by him or relates to what he calls "the Diamond Warrants."  *See id.* ¶ 35.

## VII.    The Vensure Asset Sale

On January 3, 2020, ShiftPixy also entered into an asset purchase agreement with Shiftable HR Acquisition LLC, part of Vensure Employer Services, Inc. ("Vensure").  In connection with that agreement, ShiftPixy assigned client contracts representing approximately 70% of its billable clients, which comprised approximately 88% of its quarterly revenue as of November 30, 2019, and certain operating assets in exchange for $19.2 million in cash (the "Vensure Asset Sale").  *Id.* ¶ 37; Dkt. No. 1-12 at 1.  Of that $19.2 million, $9.7 million was received at closing and $9.5 million is due over the next four years.  Dkt. No. 1-12 at 1.

## VIII.    The Sub-Penny Issuance

On March 25, 2020, with the written consent of a majority of shareholders, ShiftPixy filed Amended and Restated Articles of Incorporation which gave holders of its class A preferred stock, par value $0.0001, the right to convert into common stock on a one-for-one basis.  Compl. ¶ 44; *see* Dkt. No. 1-10.  Absher and another controlling shareholder held the preferred options which were exercisable into the shares of class A preferred stock.  The holders of preferred stock previously had no right to convert into common stock of ShiftPixy.  Compl. ¶¶ 43-44.

On June 4, 2020, Absher exercised 12,500,000 preferred options to purchase 12,500,000 shares of ShiftPixy's preferred stock, par value $0.0001 per share, for $0.0001 per share (at a total of $1,250), and thereafter, converted the 12,500,000 shares of preferred stock into 12,500,000 shares of common stock (the "Sub-Penny Issuance").  *Id.* ¶ 48.  This transaction diluted other public shareholders to 4.8% of the outstanding shares of ShiftPixy's common stock. *Id.* ¶¶ 1, 49.

## IX.    The Public Offering

On May 20, 2020, ShiftPixy entered into an underwriting agreement with A.G.P./Alliance Global Partners ("A.G.P.") in connection with a public offering of stock and warrants.  Dkt. No. 1-12 at 3.  The public offering closed on May 26, 2020 and ShiftPixy received net proceeds of approximately $10.9 million.  *Id.*  On June 11 and July 7, 2020, ShiftPixy closed partial over-allotment options exercised by A.G.P. to purchase, in the aggregate, 334,180 additional shares of common stock resulting in net proceeds of $1.24 million.  *Id.*

In later public filings, ShiftPixy stated that:

> As of August 14, 2020, options to purchase 42,559 shares of common stock at a weighted-average exercise price of $102.44 per share were outstanding, options to purchase 1,393,597 shares of common stock at a weighted-average exercise price of $5.32 per share subject to shareholder approval were outstanding, warrants to purchase up to 1,896,209 shares of common stock at a weighted-average exercise

price of $8.42 per share were outstanding, and Preferred Options to purchase
11,858,560 shares of preferred stock at an exercise price of $0.0001 per share that
are convertible into an equal number of shares of common stock were outstanding.

*Id.* at 9; *see also* Compl. ¶ 41.  The impact of the May 2020 public offering was to further dilute

the holders of ShiftPixy common stock.  *Id.* ¶ 40.

## X.      Plaintiff Demands the Warrants

On May 21, 2020, after Plaintiff's alleged "several verbal demands" for delivery of

warrants, Plaintiff emailed ShiftPixy's Chief Financial Officer, Dominic Carey, demanding

delivery of the warrants.  Compl. ¶ 53.  Plaintiff claimed that the Sub-Penny Issuance "triggered

a reset in Diamond's warrants pursuant to the express terms of the anti-dilution provisions

contained in the Form of Warrant."  *Id.* ¶ 50.

> Specifically, Plaintiff wrote:
>
> We are aware that a subsequent reverse split has occurred due to the recent approval
> of the issuance of over 12 million options to the Chief Executive Officer at par
> value our warrants are subject to ratchet provisions which would technically mean
> we are owed billions of shares which we clearly do not have any intension [sic] of
> asking for.
> . . . .
> As stated on the call, it is not my intention take care [sic] over the Company or
> cause problems for the current deal.  I suggest we come to a reasonable settlement
> of shares due and have them issued immediately.  Since you asked for a number,
> we are asking for 250,000 shares of common stock to be issued in full settlement
> and satisfaction of the Warrant.

Dkt. No. 1-11.

Pursuant to the SPA, the Sub-Penny issuance did not give rise to any rights in the buyers

who, as previously mentioned, had agreed to the conversion of the March warrants into warrants

without anti-dilution protection.

Defendant Absher responded that Plaintiff "should lawyer up" because he has "been

preparing a statement of damages [Plaintiff's] firm has caused ShiftPixy from backing

[ShiftPixy] into the convertible notes."  *Id.*  He added, "If you had done your homework you

15

would have also discovered that those warrants were also crammed down by Sam.  You need to inform Sam that your right supersedes his.  Let us know how that conversation goes." *Id.*  He ended, "You should have had the good sense to tell your firm you screwed up by dragging a huge liability in with you that they would have to spend millions to litigate." *Id.*  Plaintiff responded by insisting on his entitlement to the warrants, for example, stating, "We have spoken many times about my warrant and you promised me I would get it.  Your former CFO has acknowledged my warrant the only difference being the cashless provision that we all acknowledged and is contained in my executed agreement with Drexel." *Id.*  He concluded that "despite what I am owed . . . I will continue to be a gentleman despite you being a bully. I will give up my warrant with my ratchet provision and all of the other rights thereunder which entitle me to too many shares to count in exchange for 250,000 shares of the company's commons [sic] stock. . . . If you agree to give me the shares in exchange for my warrant I will give the company a full release." *Id.*

On September 8, 2020, Diamond initiated the instant action by complaint.  *See* Dkt. No. 1.  The Complaint brings four counts: (1) specific performance against ShiftPixy; (2) breach of contract against ShiftPixy; (3) breach of fiduciary duty against Absher; and (4) tortious interference with contract against Absher.  Plaintiff alleges that ShiftPixy has refused to deliver the warrants to date.  Compl. ¶ 55.  He alleges that per the terms of the IBA and Form of Warrant attached to the SEC filings (which contain anti-dilution provisions) and the various transactions, including the $0.0001 transaction, Plaintiff is owed over one billion warrants (1,179,971,980) (the "Post Split/Post Sub-Penny Issuance Warrants").[7]  *Id.* ¶ 56.

---

[7] Plaintiff reaches this number by dividing 1,685 (the number of warrants Plaintiff alleges he was entitled to after the reverse stock split) by 0.000001428 (the $0.0001 exercise price for Absher's

Defendants moved to dismiss on October 23, 2020. *See* Dkt. No. 17. Plaintiff opposed the motion on November 20, 2020, Dkt. No. 24, and Defendants replied on December 1, 2020, Dkt. No. 25.

## LEGAL STANDARD

### I.       Fed. R. Civ. P. 12(b)(2)

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question" and must dismiss the action against any defendant over whom it lacks personal jurisdiction. *Lugones v. Pete & Gerry's Organic, LLC*, 2020 WL 871521, at *2 (S.D.N.Y. Feb. 21, 2020) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)); *see* Fed. R. Civ. P. 12(b)(2).

"[T]he plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). If an evidentiary hearing is not held, a plaintiff need make only a prima facie showing by its pleadings and affidavits that jurisdiction exists. *Dorchester Fin. Sec.*, 722 F.3d at 85. In contrast, when an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence. *Id.*; *see also Metro. Life Ins. Co.*, 84 F.3d at 567.

This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Dorchester Fin.*

---

Conversion of Preferred to Common Stock divided by $70, which is the strike price after the reverse split). Compl. ¶ 56.

*Sec.*, 722 F.2d at 85. Although the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013).

## II.     Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the

legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (internal quotation marks and citation omitted).

**DISCUSSION**

Plaintiff alleges that as a result of the "Reverse Stock Split, the Venture Asset Sale, the May 2020 Public Offering, and Conversion of Defendant Absher's Preferred Shares and Sub-Penny Share Issuance, and as a result of the full-ratchet anti-dilution price protection provisions, [he] is now entitled to more than a billion warrants that Shiftpixy has failed and refused to deliver." Dkt. No. 1 ¶ 56. To recover the billion warrants, Plaintiff brings breach of contract and specific performance claims against ShiftPixy. He also asserts claims for breach of fiduciary duty and tortious interference with contract claims against Absher. Defendants argue that the Complaint fails to state a claim against ShiftPixy and Absher and that there is no personal jurisdiction over Absher. This Court grants Defendants' motion in full.

**I.      Claims Against ShiftPixy**

Plaintiff argues that he, unlike the buyers in the March 2020 transaction, is owed "the Post Split/Post Sub-Penny Issuance Warrants" with dilution protections, and that ShiftPixy's failure to deliver said warrants constitutes a breach of Drexel's agreement with ShiftPixy of which he is a beneficiary. Compl. ¶¶ 65-66. He argues that ShiftPixy "deprived [him] of the agreed-upon consideration it bargained for" and that he is entitled to "direct and consequential damages in an amount to be determined at trial, but not less than the value of the Post Split/Post Sub-Penny Issuance Warrants, that Plaintiff Diamond is unable to exercise due to Defendant ShiftPixy's conduct." *Id.* ¶¶ 69, 71.

Under New York law, which governs Plaintiff's contract claims under the IBA's choice of law provision, "there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by

the defendant, and (4) damages.'" *Mancuso v. L'Oreal USA, Inc.*, 2021 WL 1240328, at *3 (S.D.N.Y. Apr. 2, 2021) (citing *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

The only contract which ShiftPixy had with Drexel and of which Diamond is a beneficiary is the IBA. That agreement defined in detail the placement fees to which Drexel would be entitled if it found investors for ShiftPixy, and it did not include warrants with any form of anti-dilution protection. It specified rather that Drexel would receive a portion of its compensation in the form of cash and a portion in the form of warrants equal to a specified percentage of the gross proceeds paid to ShiftPixy as part of a capital raise. The IBA provided detail with respect to the warrants, which were assignable by Drexel: they had to have a term of five years; they came with a cashless exercise provision; and they had registration rights. The IBA specified precisely the exercise price the warrants were to carry. But they did not contain any provisions that gave the warrant holders rights, in the event of an issuance of common stock at a price below the exercise price.

Under New York law, "[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *Willsey v. Gjuraj*, 885 N.Y.S.2d 528, 530 (2d Dep't 2009) (citations omitted); *see also Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at *6 (S.D.N.Y. Aug. 21, 2018) (citations omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Willsey*, 885 N.Y.S.2d at 530 (citation omitted); *see also Beach*, 2018 WL 3996931, at *6. The IBA is clear and unambiguous. Drexel was

entitled to cash and to five-year warrants at an exercise price that was a function of the capital raise it had placed. Anti-dilution provisions come in different forms; *see supra* n.2; they are complicated provisions. *See EVIP Can., Inc. v. Schnader Harrison Segal & Lewis LLP*, 2021 WL 964943, at *22 (S.D.N.Y. Mar. 15, 2021) (describing anti-dilution provisions). Drexel could have negotiated for such a provision if it had wanted to.[8] The buyers in the March transaction did so. Drexel and Diamond did not. Diamond has no right to protection for which neither he nor Drexel bargained. He also has no right to protection which would have the effect of diluting the interest in ShiftPixy of the buyers in the March transaction.

Plaintiff does not dispute that the IBA does not itself provide him anti-dilution protection. He argues nonetheless that he—but not the buyers in the March transaction—is entitled to anti-dilution protection because certain SEC filings referred to and attached as an exhibit the Form of Warrant that was attached to the SPA without also attaching a different form of warrant for warrants to be issued under the IBA. *See* Dkt. No. 24 at 7-8. He rests his argument on the language of ShiftPixy's filings and on a line of cases that hold that, in some circumstances, language in a SEC filing can create a contractual obligation. *See id.* at 10-11 (citing *Wilchfort v. Knight*, 307 F. Supp. 3d 64, 68-70, 71-74 (E.D.N.Y. 2018); *Moses v. Apple Hosp. REIT Inc.*, 2016 WL 8711089, at *1, 4-7 (E.D.N.Y. Sept. 30, 2016); *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1039-42, 1050-56 (9th Cir. 2015); *Lapidus v. Hecht*, 232 F.3d 679, 680-84 (9th Cir. 2000)). There are at least two flaws in Plaintiff's argument.

---

[8] Defendants argue that FINRA Rule 5110(a)(1)(A)(g)(8) prohibits a broker-dealer from being paid securities with a full-ratchet anti-dilution provision in a transaction such as this and that they intend to present that issue to the Court on summary judgment if the complaint survives the motion to dismiss. *See* Dkt. No. 18 at 13 n.9. In light of the Court's determination that the complaint cannot survive the motion to dismiss, it need not address the issue.

First, the IBA which defines Plaintiff's rights contains a merger and non-modification clause that states in pertinent part: "[N]o modification of this Agreement or waiver of the terms and conditions contained herein shall be binding upon the parties hereto unless approved in writing by each party." Dkt. No. 18-1 § 15. Such clauses are strictly enforced both to bar the introduction of parol evidence to alter or modify the terms of a writing or to amend it. *See Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001) (stating a merger clause applies "the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing"); *see also In re E. 51st St. Crane Collapse Litig.*, 954 N.Y.S.2d 64, 65 (1st Dep't 2012) (citing *Jarecki*, 745 N.E.2d at 1009) (determining the motion court "correctly concluded that the evidence would not have changed the prior determination, since the parties' . . . agreement contained a broad merger clause, and thus, extrinsic evidence, such as the oral agreements alleged by [appellant], should not be considered to alter, vary or contradict the written agreement").

The SEC filings fail this most basic requirement. They do not constitute a writing signed by both parties modifying or altering the terms of the IBA. Thus, they cannot be read to entitle Plaintiff to anything more than that to which he was entitled under the IBA. Notably, none of the cases cited by Plaintiff involve a claim that a SEC filing altered the terms of an agreement with an integration and non-modification clause. *See Wilchfort*, 307 F. Supp. 3d at 68-70, 71-74 (making no mention of a merger, integration, or non-modification clause in the background or breach of contract discussion); *Moses*, 2016 WL 8711089, at *1, 4-7 (same); *Northstar Fin. Advisors*, 779 F.3d at 1039-42, 1050-56 (same); *see also Lapidus*, 232 F.3d at 680-84) (making no mention of merger, integration, or non-modification clauses, or any breach of contract).

Second, and importantly, the cases cited by Plaintiff involved writings that unequivocally created contract rights. In *Wilchfort*, the defendant corporation set out in a Form S-3 the price at which employees could receive units of securities under a dividend reinvestment program. The defendant did not dispute that the language of the Form S-3 gave rise to enforceable contract rights in the employees who were not given the units at the prices they were promised. *Wilchfort*, 307 F. Supp. 3d 64 at 71 (citing *Moses*, 2015 WL 1014327, at *6). Likewise, in *Northstar Financial Advisors*, the document at issue was a mutual fund prospectus—"the primary selling document, [which] offers to sell shares to investors in a mutual fund which will invest the proceeds in the manner described in the prospectus, unless shareholders approve a proposal to do otherwise." *Northstar Fin. Advisors*, 779 F.3d at 1054. The fact that the mutual fund's promise, which the investors accepted, was also publicly filed, "hardly provide[d] a license [for the fund] to ignore the objectives enshrined by shareholder approval, which [the] mutual fund ha[d] obligated itself to pursue" or "alter[ed] the fact that the purchase of those shares constitute[d] an acceptance of the offer by the investor." *Id.*; *see also Lapidus*, 232 F.3d at 680 ("The plaintiffs seek to recover losses sustained by the mutual fund as a result of short sales made without shareholder approval, allegedly in violation of the registration statement filed with the Securities and Exchange Commission.").

The SEC filings do not fit into that category. They do not contain an offer that the broker-dealers or the March buyers accepted with consideration. *See, e.g.*, *O'Grady v. BlueCrease Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 502 (S.D.N.Y. 2015) (describing offer, acceptance and consideration as elements of contract formation), *aff'd*, 646 F. App'x 2 (2d Cir. 2016). They describe already completed transactions. They cannot give rise to contract rights.

Moreover, even if the SEC documents could be considered to be offers that are then accepted with consideration, they cannot be read to suggest that Drexel or its assignees are entitled to the warrants granted to the buyers in the SPA or to give them the same rights as those buyers. The Form 8-K itself, which is incorporated into all of the later SEC filings, plainly limits the definition of Warrants to those granted pursuant to the SPA. It does not include the warrants issued to the bankers as among the Warrants to which the Form refers. Indeed, even absent the merger clause in the IBA, the Form of Warrant itself plainly refers only to the securities offered and sold pursuant to the SPA, with no reference to Diamond's warrants. Not only does it bear the exhibit number of the SPA – which also is attached to the SEC filings – but it also states explicitly that it is the warrant issued pursuant to the SPA:

> This Warrant is one of the Warrants to Purchase Common Stock (the "SPA Warrants') issued pursuant to Section 1 of that certain Securities Purchase Agreement, dated as of March 11, 2019 (the "Subscription Date"), by and among The [ShiftPixy] and the invests (the "Buyers") referred to therein, as amended from time to time (the "Securities Purchase Agreement").

Dkt. Nos. 1-2, 1-4, 1-7.

The Form of Warrant does not purport to apply to the warrant issued to Drexel or Diamond pursuant to the IBA. The SPA itself which is attached to all the SEC filings and contains the protections for the buyers, does not mention a word about dilution protection as part of the placement fee. All it says about the placement fee is: "Placement fees are calculated as 7.5% of gross proceeds or $281,250 50/50 between Stifel and Drexel." Dkt. No. 18-2, Schedule 3(g). Plaintiff points out that the broad term "Warrants" in ShiftPixy's Form S-3 and Amended Form S-3 filings is not limited to the warrants issued as part of the SPA, but also includes those warrants issued pursuant to the IBA. *See* Dkt. No. 1-3 at 6; Dkt. No. 1-6 at 6. He also points to filing requirements under SEC Regulation S-K ("S-K"). *See* Dkt. No. 24 at 12. Regulation S-K

requires: "All instruments defining the rights of security holders, including indentures" to be disclosed as exhibits to the Form S-3. 17 C.F.R. § 229.601(b)(4).

But the Form S-3 and the Amended Form S-3 cannot do the work Plaintiff requires of them. The S-3 mentions nothing about anti-dilution rights, but as noted, the attached Form of Warrant refers to the warrants granted pursuant to the SPA. Read in its entirety, the Form S-3 cannot fairly be understood to imply that the Form of Warrant attached to it describes the warrants to which Drexel was entitled as a placement fee or to say anything about anti-dilution rights for those warrants.

The Amended Form S-3 does refer to anti-dilution rights but states only that the buyers pursuant to the SPA have those rights. It says nothing about the placement fee under the IBA. Even more than the Form S-3, it cannot be understood to imply that the warrants pursuant to the IBA would have the same rights as those sold pursuant to the SPA.

Plaintiff's complaint thus comes down to the fact that ShiftPixy did not attach to the SEC filings the form of warrant to which he was entitled. But even assuming ShiftPixy was required to include such a form of warrant to comply with Regulation S-K, the failure to include such a form of warrant cannot confer on Plaintiff anti-dilution protections.

Diamond also asserts that even if he was not entitled to anti-dilution protection, he was entitled to warrants without anti-dilution protection. He did not receive such warrants. The motion to dismiss thus is granted only with respect to the claim for warrants with anti-dilution protection.

## II.     Claims Against Absher

### A.     Personal Jurisdiction

To determine whether the exercise of personal jurisdiction is proper in a diversity case, the Court must conduct a two-part inquiry: first, the Court looks at whether there is a basis for

personal jurisdiction under the laws of the forum state, and second, the Court must examine

whether the exercise of personal jurisdiction comports with constitutional due process. *See Licci*

*v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013); *Bank Brussels Lambert v.*

*Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).[9]

## 1.    N.Y. C.P.L.R. § 302(a)(1)

Plaintiff asserts that the Court has specific personal jurisdiction over Absher pursuant to

N.Y. C.P.L.R. § 302(a)(1).  New York's specific jurisdiction statute states that "a court may

exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in

person or through an agent":

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).  Unlike New York's general jurisdiction statute, N.Y. C.P.L.R. § 301,

"CPLR § 302 allows courts to exercise specific jurisdiction over corporate principals based on

transactions made or acts taken in a corporate capacity."[10]  *Wallace Church & Co. Inc. v.*

---

[9] The Court notes that, in the IBA, ShiftPixy consented to "the exclusive jurisdiction of the courts located in New York County, New York, in connection with any claim or dispute relating to this Agreement or any services or advice provided hereunder."  Dkt. No. 18-1 § 16.  Absher signed this agreement on behalf of ShiftPixy.  But Plaintiff does not rely on that provision to assert personal jurisdiction over Absher here.  *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *8-9 (S.D.N.Y. Mar. 10, 2021) (discussing whether corporate consent to jurisdiction binds signatory in individual capacity).

[10] Plaintiff does not assert that the Court has general jurisdiction pursuant to Section 301.  Dkt. No. 24 at 19.

*Wyattzier, LLC*, 2020 WL 4369850, at *5 (S.D.N.Y. July 30, 2020); *see Retail Software Servs. Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (upholding long-arm jurisdiction over corporate employees who were the "primary actors" in the transaction in New York that was the source of the litigation) (citing *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 47 (N.Y. 1988)).

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(1), Plaintiff must allege that: (1) Absher has "transacted business" in New York, and (2) the claim asserted arises from that business activity. *Eades v. Kennedy PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015); *see Licci*, 732 F.3d at 168. A non-domiciliary defendant need not be physically present in New York to "transact business," so long as the defendant has engaged in "purposeful activity," for example, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-47 (2d Cir. 2007) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The Court looks to the "quality" and not the quantity of the contacts. *Fischbarg v. Doucet*, 880 N.E.2d 22, 26-27 (N.Y. 2007) (finding purposeful activity where defendant attempted to establish relationship through calls, faxes and emails projected into New York over months). "New York courts have held that a claim 'arises from' a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (internal citations omitted). "A connection that is 'merely coincidental' is insufficient to support jurisdiction." *Id.* "As a specific jurisdiction statute, section 302(a)(1) authorizes New York courts to exercise personal jurisdiction over a foreign defendant only if the cause of action asserted against it is one arising from the transaction of such business." *Realuyo v. Abrille*, 93 F.

App'x 297, 299 (2d Cir. 2004) (summary order); *see Homeschool Buyers Club, Inc. v. Brave Writer, LLC*, 2020 WL 1166053, at *4 (S.D.N.Y. Mar. 11, 2020).

Plaintiff fails to establish personal jurisdiction over Absher under section 302(a)(1). In response to Defendant's motion to dismiss, Plaintiff argues in his opposition brief that "Absher directly transacted business related to Plaintiff's claims in New York, attended multiple meetings in New York with Diamond, and as a result of those meetings, did obtain the bridge financing, for which Diamond received warrant placement fees at issue in this action." Dkt. No. 24 at 20. Specifically, Absher:

> [T]raveled to New York and attended several in person meetings with Diamond and/or his investment banking team, and with various funds/financing entities during October 29-November 1, 2018, November 9, 2018, and April 16-17, 2018. Absher also participated in several telephonic conference calls from Stifel's office located at 787 7th Avenue, 6th Floor, New York New York. The meetings that Absher and Diamond attended in New York, described above and more fully in the Diamond Affidavit, ultimately resulted in the March 2019 bridge financing, for which Diamond received the warrants as placement fees that are at issue in this action.

Dkt. No. 24 at 21-22 (citing Dkt. No. 24-2 ¶¶ 3-8, 6, 9, 10) (the "IBA meetings"). He supports those assertions with an affidavit that contains further information for each of these meetings, including the times and location of each meeting and the participants, including Absher, at each meeting. *See* Dkt. No. 24-3. He also attaches ShiftPixy's itineraries for two of the meetings. *See* Dkt. Nos. 24-3, 24-4.

The Court considers such allegations even though they are not in the complaint because they are supported by an affidavit. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 889 (2d Cir. 1981) ("In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone . . ."). The allegations are not sufficient to establish jurisdiction over Absher. Each of the contacts Plaintiff identifies occurred before the March 2019 Bridge Financing and therefore

before any right by Diamond to the warrants arose. However, each of Plaintiff's breach of fiduciary duty and tortious interference claims is entirely "forward-looking in nature." *Homeschool Buyers Club, Inc.*, 2020 WL 1166053, at *5 (S.D.N.Y. Mar. 11, 2020). Plaintiff's cause of action for breach of fiduciary duty turns upon acts that took place *after* the March 2019 Bridge Financing and upon proof that at the time those actions occurred Defendant had a fiduciary duty to Plaintiff. Plaintiff alleges Absher took de facto control of ShiftPixy through the Amendment to the Articles of Incorporation and Sub-Penny Issuance, participated in the issuance of allegedly false and misleading statements with the SEC regarding the March 2019 Warrants, and after taking control of ShiftPixy took various actions to benefit himself and at the expense of ShiftPixy itself and its common stock shareholders. Compl. ¶ 75. His claim does not depend in any way on the circumstances under which he acquired the right to his warrants. His claim, and the duties Absher owed as a fiduciary, would have been exactly the same had Plaintiff obtained his interest in ShiftPixy in some other way. The breach of fiduciary duty claim thus does not arise out of the New York contacts. *See Barrett v. Tema Development (1988), Inc.*, 463 F. Supp. 2d 423, 431 (S.D.N.Y. 2006) (noting that for jurisdictional purposes, claims related to breach of fiduciary duties must "arise from facts related to the elements of the claim—the existence of a fiduciary duty between the parties and the breach of that duty"); *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 232-233 (S.D.N.Y. 2013) (report and recommendation) (recommending dismissal of breach of fiduciary duty claim because, although defendant transacted business in New York, "Plaintiff ha[d] not alleged the existence of any 'nexus' between [Defendant's] New York-based transactions and Plaintiff's causes of action"); *cf. Thorsen v. Sons of Nor.,* 996 F. Supp. 2d 143, 157 (E.D.N.Y. 2014) (finding jurisdiction under

Section 302(a)(1) where defendants allegedly breached their fiduciary duty by conducting a "faulty investigation" within the state of New York).

A similar point can be made about the tortious interference claim. Plaintiff alleges that Absher engaged in "wrongful and tortious conduct" by "procur[ing] a breach of the Investment Banking Agreement by directing and instructing Defendant Shift[P]ixy to refuse to deliver the Post Split/Post Sub-Penny Issuance Warrants due thereunder." Compl. ¶ 81. But, although that claim depends upon there being a contract between Shiftpixy and Plaintiff, it does not arise from that contract. It arises entirely from Absher's conduct *after* the contract was formed. It is irrelevant whether Absher was involved in the original agreement between Shiftpixy and Plaintiff; the allegation would have been identical even if he were not involved. Absher's duties turn, not upon the vagaries of the agreement between Shiftpixy and Plaintiff, but upon the New York law of torts and the question whether he violated those duties turns not upon what he did in New York, but what he did elsewhere after the contract was formed. The claim thus does not arise out of his New York contacts.

The New York Court of Appeals' decision in *George Reiner & Co. v. Schwartz*, 363 N.E.2d 551, 554 (N.Y. 1977) is distinguishable. There, the Court of Appeals held that a defendant who was "physically present in New York at the time the contract, establishing a continuing relationship between the parties, was negotiated and made," *id.*, was subject to personal jurisdiction in New York when "[s]ometime after termination of the employment relationship [which the contract created], [the defendant] "knowingly, willfully and fraudulently violated the terms of the contract," *id.* at 552. The *Reiner* court called the case "the 'clearest sort of case' in which our courts would have 302 jurisdiction," because "the contract, made in New York, was the transaction out of which the cause of action arose." *Id.* at 554.

Here, by contrast, the IBA did not establish a continuing relationship, and the causes of action against Absher are not for breach of contract, but instead for breach of fiduciary duty and tortious interference. Absher's duties were not defined by any agreement reached in New York, he is not being sued for violation of obligations created in New York, and the claim against him does not turn in any way upon any of his conduct in New York. That conduct is all irrelevant to the claim. Thus, *Reiner* does not support the exercise of jurisdiction.

Accordingly, this Court may not exercise personal jurisdiction over Absher pursuant to Section 302(a)(1) of New York's long-arm statute.

## B.     Breach of Fiduciary Duty

Even if there were personal jurisdiction over Absher, Plaintiff has failed to state a claim for breach of fiduciary duty or tortious interference with contract.

Plaintiff alleges Absher breached his fiduciary duty that, as "an Officer and Director and person in control" of ShiftPixy, he owed to "the shareholders of ShiftPixy," including Plaintiff. Compl. ¶ 73. He claims that Absher "breached his duties of loyalty and due care and did not act in good faith with respect to plaintiff Diamond by," inter alia, taking control of ShiftPixy through the $0.0001 transaction, failing to deliver warrants upon request, filing statements with the SEC that falsely stated all March 2019 Warrants included anti-dilution protections, diluting common stock, managing ShiftPixy for his own benefit and to the detriment of other shareholders, and depriving Plaintiff of his interest in ShiftPixy. *Id.* ¶ 75. Defendants move to dismiss on the basis that Absher did not owe any fiduciary duties to Plaintiff because Plaintiff had never exercised his warrants to become a shareholder. *See* Dkt. No. 18 at 14-15. Plaintiff does not dispute that he

was not a shareholder,[11] but rather argues that he is owed fiduciary duties even as a warrant holder under the governing law.

"A federal court sitting in diversity applies the choice of law rules of the state in which the court sits." *Cartwright v. D'Alleva*, 782 F. App'x 77, 78 (2d Cir. 2019) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012)). "In New York, the laws of the state of incorporation govern a claim of a breach of fiduciary duty." *Cartwright*, 782 F. App'x at 78 (citing *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980)); *see also BHC Interim Funding, L.P. v. Finantra Cap., Inc.*, 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003) ("Under New York's choice of law principles, a claim involving breach of a fiduciary duty owed by a corporate officer is governed by the law of his company's state of incorporation."). Here, ShiftPixy is incorporated in Wyoming. Both parties agree that Wyoming law governs this claim for breach of fiduciary duty.

Plaintiff, however, cites no support for his proposition that, under Wyoming law, a corporate officer owes fiduciary duties to a warrant holder. Instead he cites a case from this District, which held that "[u]nder either California or New York law, an option holder, unlike a shareholder, is not owed a fiduciary duty by a corporation's officers." Dkt. No. 24 at 15 (quoting *BHC Interim Funding, L.P.*, 283 F. Supp. 2d at 989). He argues that the absence of a similar explicit prohibition in Wyoming case law means "there is no prohibition against and no basis to dismiss plaintiff's breach of fiduciary duty claim against Absher." *See* Dkt. No. 24 at 15 ("Despite an exhaustive search of Wyoming case law, there is no prohibition on a warrant holder bringing a breach of fiduciary duty claim against an officer or director of a corporation.").

---

[11] At most, Plaintiff argues that "had Shiftpixy delivered the warrants due and owing to Plaintiff, Plaintiff could have and would have exercised them" as a shareholder. Dkt. No. 24 at 15. This statement is mere speculation.

Plaintiff's argument fails for two reasons: (1) the case he cites is persuasive for the opposite proposition from what he is trying to assert; and (2) he mischaracterizes his pleading burdens.

First, the fact that New York and California law dictate that option holders are not owed a fiduciary duty by corporate officers is persuasive that the same—not the opposite—would be true for Wyoming. Indeed, other courts have held that "the relationship between a warrant issuer and warrant holders is wholly contractual, and no fiduciary duty ordinarily arises out of that relationship." *Barney Holland Oil Co. v. FleetCor Techs., Inc.*, 2007 WL 9702207, at *9 (N.D. Ga. Aug. 17, 2007) (applying Delaware law) (internal citation omitted); *see Helvering v. Sw. Consol. Corp.*, 315 U.S. 194, 200 (1942) ("Whatever rights a warrant holder may have to require the obligor corporation to maintain the integrity of the shares covered by the warrants he is not a shareholder. His rights are wholly contractual. . . . [H]e does not become a stockholder, by his contract, in equity any more than at law.") (internal citations and quotation marks omitted*); U.S. Small Bus. Admin. v. Katawczik*, 107 F. App'x 281, 286 (3d Cir. 2004) (no duty absent a provision "in the Warrant itself that imposes upon [the company] or its directors or officers any duty—fiduciary or otherwise," especially given that plaintiff had "identified no other source of this asserted duty from state or federal statutes, regulations, or common law"); *cf. Powers v. Brit. Vita, P.L.C.*, 969 F. Supp. 4, 5 (S.D.N.Y. 1997) ("[N]o fiduciary duties are owed to option holders under Delaware law."). Plaintiff has pointed to no source for his breach of fiduciary claim.

The Wyoming Supreme Court defines a fiduciary as "[a] person having [a] duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking." *Martinez v. Assocs. Fin. Servs. Co. of Colo.*, 891 P.2d 785, 790 (Wyo. 1995)

(quoting Black's Law Dictionary (6th ed. 1990)).  A "[f]iduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary." *Id.* (citation omitted).  Plaintiff has not alleged that Absher created a fiduciary duty to him as a warrant holder, beyond the duties in the IBA, by Absher's "own undertaking" or "conduct."

Second, Rule 8 of the Federal Rules of Civil Procedure requires Plaintiff's claim for relief to contain "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Plaintiff's argument that his claim is not prohibited by Wyoming law falls short of showing that he is "entitled to relief" under it.  *See Iqbal*, 556 U.S. at 679 (alterations omitted) (quoting Fed. R. Civ. P. 8(a)(2)) ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"); *see also Al-Haj v. Singer*, 2020 WL 526239, at *2 (S.D.N.Y. Feb. 3, 2020) (concluding that plaintiff failed to state a claim that he was entitled to relief partly because he did not suggest any of his rights were violated); *Harris v. U.S. Dep't of Hous. & Urb. Dev.*, 2020 WL 4570512, at *2 (S.D.N.Y. Aug. 6, 2020) (same).

For these reasons, Plaintiff has failed to state a claim for breach of fiduciary duty against Defendant Absher.  Accordingly, Count III of the Complaint is dismissed.

## C.     Tortious Interference with Contract

Finally, Plaintiff alleges that Absher committed tortious interference with the IBA when he "procured a breach of the Investment Banking Agreement by directing and instructing Defendant ShiftPixy to refuse to deliver the Post Split/Post Sub-Penny Issuance Warrants due thereunder."  Compl. ¶ 81.  This claim too fails.

Under New York law, the elements of tortious interference with contract are: "(i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018).

Where the defendant is an officer of a corporation that is party to a contract, they are "generally not considered third parties to the contract" who can interfere with it. *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 298 (E.D.N.Y. 2012). "A director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken." *Id.* (quoting *Murtha v. Yonkers Child Care Ass'n, Inc.*, 383 N.E.2d 865, 866 (N.Y. 1978)); *see also Solow v. Stone*, 994 F. Supp. 173, 181 (S.D.N.Y.), *aff'd*, 163 F.3d 151 (2d Cir. 1998) ("A corporation's officer or director generally cannot be held liable under a theory of tortious interference for causing the corporation to breach a contract."). Similarly, "an agent cannot be held liable for inducing its principal to breach a contract with a third person, at least where it is acting on behalf of its principal and within the scope of its authority." *Kriss v. Bayrock Grp. LLC*, 2016 WL 7046816, at *22 (S.D.N.Y. Dec. 2, 2016) (quoting *Devash LLC v. German Am. Cap. Corp.*, 959 N.Y.S.2d 10, 15 (1st Dep't 2013)). The policy behind this rule is that "[t]o hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations." *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 390 (1st Dep't 2002) (citations omitted).

However, an exception is available where the officer took their actions outside of the scope of their employment or acted with malice for personal gain. "To establish a corporate officer's liability for inducing a breach of a contract between the corporation and a third party, the complaint must allege that the officers' acts were taken outside the scope of their employment or that they personally profited from their acts." *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 534 (1st Dep't 1998) (internal quotation marks and citations omitted).

Such a claim is "governed by an enhanced pleading standard," and requires "a particularized pleading of allegations that the acts of the defendant corporate officers which resulted in the tortious interference with contract either were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation." *Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (1st Dep't 2003); *see also Chambers Assocs. LLC v. 105 Acquisition LLC*, 831 N.Y.S.2d 55, 56 (1st Dep't 2007) (citation omitted) ("[T]his claim alleges acts committed by the individual corporate officer, but there is no particularized pleading that such acts were either beyond the scope of his employment or motivated by his desire for personal gain."). Personal gain is construed to mean that "the challenged acts were undertaken with malice and were calculated . . . for the personal profit of the . . . defendant." *Petkanas*, 759 N.Y.S.2d at 2; *see also Iconoclast Advisers LLC v. Petro-Suisse Ltd.*, 851 N.Y.S.2d 58, 58 (Sup. Ct. 2007) ("[T]he plaintiff must make a particularized pleading, in nonconclusory language, of facts establishing that the officer's acts were beyond the employment scope, or were performed with malice and motivated by a desire for personal gain.") (citing *Chambers*, 831 N.Y.S.2d at 55; *Petkanas* 759 N.Y.S.2d at 2; *Joan Hansen* 744 N.Y.S.2d at 389-91). Plaintiff fails to meet this enhanced pleading standard. Plaintiff's allegations in the Complaint are conclusory and do not provide a "particularized pleading" of allegations that

Absher's acts were beyond the scope of his employment or motivated by malice.  *See, e.g.*, Compl. ¶ 83 ("Defendant Absher's tortious conduct was carried out for his own personal financial interest and benefit, and not in the interests of Defendant ShiftPixy or its shareholders.").

In his opposition to the motion to dismiss, Plaintiff argues that Absher acted to benefit himself when he caused ShiftPixy to refuse to deliver the warrants owed to Diamond, when he caused ShiftPixy to amend its articles of incorporation to authorize his personal receipt of shares through the Sub-Penny Share issuance, and when he purchased 12.5 million shares at this sub-penny price, thereby diluting the interests of other shareholders.

But Plaintiff does not allege facts to support that Absher was acting beyond his scope of employment or for personal gain, construed in terms of malice for the sake of personal profit. Plaintiff argues that he "made sufficient allegations of personal gain, and whether Absher acted for personal gain and outside the scope of his corporate authority, is a factual issue that is not properly before the Court on a 12(b)(6) motion." *Id.* at 24.  However, this mischaracterizes Plaintiff's burden under the "enhanced pleading standard" for tortious interference claims against corporate officers.  The caselaw requires particularized nonconclusory pleadings of these factors, and without them, Plaintiff fails to bring forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

Accordingly, the tortious interference claim against Absher is dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

The motion to dismiss is GRANTED with prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 17 and to terminate the action.

SO ORDERED.

Dated: July 13, 2021
   New York, New York

_____
LEWIS J. LIMAN
United States District Judge